

# Rocky Mountain Rehab, P.C.

## Disability Assessment

-for-

## Rodney Miears

Prepared on:

October 2, 2019

At the request of:

Scott Stinson, Esq.
Stinson Law Group, P.C.
421 West Mendenhall Street
Bozeman, Montana 59715

By:

Reg Gibbs, MS, CRC, LCPC, CBIS, CLCP, FIALCP
Rocky Mountain Rehab, P.C.
P.O. Box 20253
Billings, Montana 59104
(406) 259-7495

**Exhibit 3**

# Table of Contents

**1**   Narrative

**2**   Curriculum Vitae for Reg L. Gibbs, MS

**3**   Publication History for Reg L. Gibbs, MS

**4**   RMR Schedule of Fees and Conditions

Dear Mr. Stinson:

As you requested, I have prepared a disability assessment for Rodney Miears, who has ongoing medical issues resulting from injuries sustained in a motor vehicle accident on June 15, 2015.  My analysis of Mr. Miears' care needs has several bases.  I have reviewed various records and reports written by his medical providers in order to familiarize myself with his treatment history, and a personal interview of Mr. Miears has given me a better understanding of his functioning before and after the time of his injury.


# **Background**

Rodney Ira Miears is a thirty-two-year-old married male resident of Cody, Wyoming. Born February 28, 1987 in Orange, Texas, he is of European American heritage and his native language is English.  He is the husband of Marian Miears, age thirty-two, and the father of two children: Jackson Miears, age four, and Anthony Miears, age two.

Mr. Miears is right-handed and holds a valid Wyoming driver's license with no restrictions.  He owns a 2016 GMC Sierra that provides reliable transportation, as does his wife's 2018 Toyota Sequoia.

Marian Frances Northup Miears was born on September 26, 1987 and is in good health according to her husband.  The two married on May 22, 2011 and they now reside in a single-story home with a finished basement.  The house comprises approximately 4,300 square feet, and Mr. Miears and his wife share it with their two children, four pet dogs, and one cat.

**Educational History**
Mr. Miears was graduated from Cody High School in Cody, Wyoming in 2006.  He then enrolled at Laramie County Community College in Cheyenne, where he studied from 2006 to 2008 and earned an associate degree in criminal justice.  From 2008 to 2009 he was a student at the University of Wyoming in Laramie, where he studied criminal justice and law enforcement.

Rather than continue his university studies, Mr. Miears decided to enroll at the Wyoming Law Enforcement Academy in Douglas in 2009.  After studying there, he later enrolled at the Wyoming Highway Patrol Academy, where he attended classes in both Cheyenne and Guernsey from 2009 to 2010.

**Work History**
While he was in high school, Mr. Miears worked for a concrete company during the summertime.  He was also a shift manager at a fast food restaurant, and he had a job bussing tables at another restaurant.  While in college he was a resident assistant at a dormitory and he worked as a student activities director.  He continued to do work for the concrete company between spring and fall semesters.

When he attended the University of Wyoming, Mr. Miears officiated at intramural athletic events and he worked at a sandwich shop. From 2010 to 2018 he was a trooper with the Wyoming Highway Patrol, first in Basin and later in Cody. At present, he works full-time for the Wyoming Highway Patrol as a Tow and Recovery Program Coordinator. He has held this position since August of 2018.

**Injury and Treatment**

On June 15, 2015 Mr. Miears was patrolling the North Fork Highway near Cody when his patrol vehicle was involved in a head-on collision with a semi-truck. He lost consciousness in the collision, and when he became conscious again he found that a bystander was attempting to help him out of the patrol vehicle. His vision was blurred, and his legs were pinned underneath the dashboard of the car. He felt pain throughout his body. An ambulance crew that arrived on the scene transported him to West Park Hospital in Cody.

Although a CT scan of Mr. Miears' head and cervical spine made on the day of the accident revealed nothing abnormal, he experienced ongoing severe headache, along with pain in his thoracic spine. He sought treatment for these symptoms throughout the summer, but his pain persisted. In the fall of 2015 he received multiple selective nerve root injections in his thoracic spine, and on December 2 a physician diagnosed him with "right thoracic foraminal stenosis."

Released to full-duty work with no restrictions in February 2016, Mr. Miears returned to his job as a state trooper. On the job, he experienced a significant increase in pain in his back, and on January 17, 2018 an orthopedist diagnosed him with "chronic thoracic back pain" aggravated by prolonged sitting. A subsequent functional capacity evaluation found him physically incapable of fulfilling the duties of a state trooper. He was then medically retired from this position and accepted a different position with the Wyoming Highway Patrol.

At present, Mr. Miears experiences a chronic ache and intermittent sharp pain in his mid-back, accompanied by shortness of breath. He also experiences intermittent pain in his head and his right knee. He is currently under the care of orthopedic surgeons Stephen Emery, M.D. and Frank Schmidt, M.D., and chiropractor Vince Kalkowski, D.C., and physician assistant Craig Edwards, P.A.,

**Pre-Injury Functioning**

During his sophomore year of high school, Mr. Miears was knocked unconscious while playing football. Although he regained consciousness less than ten seconds later, the team's coach had him examined by the trainer, who held him back from playing for the rest of the game. On a skiing trip with his wife in 2008, he descended a large ski jump and landed on hard-packed snow, striking his head and losing consciousness for ten to fifteen seconds. Although he received no medical attention afterward, he reports that he experienced no cognitive changes and does not believe that he was seriously injured.

In 2014 Mr. Miears sought medical care for abdominal pain.  A colonoscopy revealed no internal bleeding, and Mr. Miears' pain finally resolved after he removed the k-bar knife from his gun belt.  He had no diagnosed medical conditions prior to the time of his injury in June 2015, and he had never undergone surgery.

## Physical
### Pain
On one or two occasions per year Mr. Miears would experience sharp pain in his right wrist when opening a tightly sealed jar.  If he continued trying to open the jar, the pain would increase.  He had experienced pain in this situation since about 2009, when he was injured while being trained in methods of disarming a suspect.  Since he never sought medical treatment, however, he does not know what the injury is.

Asked to rate the pain that he felt in his wrist on a zero-to-ten scale, with zero representing no pain and ten unbearable pain, Mr. Miears rated it three.  Once he ceased his attempt to open a jar, the pain would lessen in about ten minutes' time to a level that he rated one.  Within forty-eight hours it would disappear completely.  Knowing that he was susceptible to pain in this area, he attempted to limit the torque that he would exert on lids when opening jars.

### Sensory Functioning, Balance, and Coordination
Each of Mr. Miears' five senses were reportedly functional prior to June 15, 2015.  He experienced no unusual dizziness, and no deficits of balance or coordination were apparent in his functioning.

### Cardiopulmonary Functioning
When asked if he had had any cardiac problems prior to the time of his injury, Mr. Miears answered in the negative, and he gave the same answer when asked if he had experienced any pulmonary abnormalities.  He had no asthmatic symptoms, and he did not experience any dyspnea.

### Urinary Tract
Mr. Miears experienced no urinary urgency or incontinence before June 15, 2015.  He had no history of bladder infections, nor did he have any renal problems.

### Gastrointestinal Functioning
Regarding his gastrointestinal functioning, Mr. Miears indicated no problems prior to the time of his injury.  His bowel movements were regular, and he experienced no bowel incontinence.

### Medications
As of June 15, 2015, Mr. Miears did not use any medications on a regular basis.

### Sexual Functioning
By his own report, Mr. Miears experienced no sexual dysfunction before the June 2015

accident.

### Sleep

As a highway patrolman, Mr. Miears would work day shifts for a month at a time, and for the next month he would work night shifts in a rotating schedule.  A day shift began at either 6:00 a.m. or 7:00 a.m. and ended at 3:00 p.m.  His night shift began at 3:00 p.m. and lasted until 12:00 a.m. or 1:00 a.m.  On evenings after a day shift he would retire to bed for the night at 10:00 p.m.  After finishing a night shift, he would retire to bed sixty to ninety minutes after returning to his home.

On most nights, Mr. Miears would fall asleep within fifteen to twenty minutes of going to bed.  However, he reports that falling asleep took at least an hour on nights following particularly tense policing incidents, such as a motor vehicle pursuit.  He did not use any sedative medication, and his sleep was uninterrupted by nightmares.

Mr. Miears would rise for the day at either 5:00 a.m. or 6:00 a.m. for a day shift, and at 8:00 a.m. or 9:00 a.m. on days when he was assigned an evening shift.  His sleep was restorative, and although he would occasionally experience daytime drowsiness, he did not take any naps.  In a typical twenty-four-hour period he slept from eight to nine hours.

### Motor Activities

Until the time of his injury, Mr. Miears could frequently lift and carry loads weighing up to one hundred eighty pounds, and he could occasionally lift and carry a load of two hundred pounds.  He had no condition that limited his capacity for sitting, standing, or walking and could do any combination of the three for an entire work day.  At times he would take a hike lasting up to fifteen hours, and he could hike for twenty-six miles when searching for animal horns in the wilderness.  In each of the five years immediately preceding the June 2015 accident, he competed in three mini-triathlons.

Having a full range of motion in all joints, Mr. Miears could reach in any direction.  He had no difficulty kneeling, crouching, bending from the waist, or rotating his torso.  Grasping objects presented no special challenges for him, and he reports that he had a functional grip.

### Environmental Tolerances

Before the June 2015 accident, Mr. Miears could tolerate an environmental temperature as high as one hundred ten degrees Fahrenheit and one as low as twenty-five degrees below zero.  A rapid change in the temperature of his surroundings had no adverse effect on his functioning, nor did exposure to moisture or humidity.

When asked if exposure to fumes, odors, dust, or chemical agents had had any unusual effect on his functioning, Mr. Miears answered in the negative.  Additionally, he could be exposed to loud noise and bright light without experiencing functional difficulties, and vibration did not cause him any such problems, either.  His job duties often exposed him to unprotected heights, and he reports that he had to use ladders, scaffolds, and bucket

trucks in the course of his duties.  However, he had no condition that made such exposure unusually risky for him.

### Integumentary System

Mr. Miears' skin did not bruise easily before the time of his injury, nor was he unusually susceptible to skin rashes or ulcers.

### Other

In "excellent" physical condition, Mr. Miears felt no unusual fatigue.  He had never experienced any usual weight gain or loss, and he reports that his functioning was consistent from one day to the next, both physically and psychologically.  When asked about his dental history, he indicated that it was unremarkable.

### Cognitive

No cognitive deficits of any kind were apparent in Mr. Miears' functioning.  A quick thinker, he had no difficulty focusing or maintaining attention, and he could solve all problems that he encountered at work and at home.  His working memory was unimpaired, as were his short-term memory and his long-term memory.  Being cognizant of safety risks, he took appropriate precautions, and he knew the proper measures to take in emergency situations.

Mr. Miears was not inclined to act impulsively before the time of his injury, but he had no difficulty initiating activity.  Neither planning ahead nor organizing work to be done was especially challenging for him.  Asked about his capacity for multi-tasking, he indicated that he could keep track of four or five tasks at once.  His sense of the passage of time was accurate.

Following instructions accurately presented no special difficulties for Mr. Miears, regardless of whether they were given to him in speech or in writing.  He experienced no word-finding difficulty in conversation, and he had no condition that made use of a telephone or computer problematic.  By his own report, he was proficient in the use of spreadsheets and word-processing software, as well as Microsoft PowerPoint.  He could read and respond to mail that he received, and he monitored his financial records closely.

### Emotional/Behavioral

Before the time of his injury, Mr. Miears had never experienced any abnormal anxiety or any depression.  His self-image was positive, and he had received counseling only once during his life, this being marriage counseling that he and his wife had received for about two and a half months in 2014.  He was not irritable or impatient, and he did not become frustrated easily.  When asked about his tolerance for stress, he described it as "high." He answered in the negative when asked if he had laughed or cried at inappropriate times.

Although he experienced no anxiety in crowds, Mr. Miears had a habit of scanning crowds that he had developed as a law enforcement officer.  He did not isolate himself socially, and he reports that he had three close friends, as well as other friends whom he

saw less often.  His marriage was harmonious, and he had a "cordial" relationship with his four siblings.  Regarding his parents, he reports that his father had passed away when he was sixteen and he had had no contact with his mother.  He was close to his aunt and uncle and would talk to them almost every day.

Once every week to two weeks Mr. Miears would drink five or six servings of beer. Although he did not smoke, he chewed smokeless tobacco on several occasions per week. He did not gamble or use illegal drugs, and he had never been treated for chemical dependency of any kind.

## Way of Life
### Housing and Transportation
At the time of the subject accident, the Miears already lived in the house in which they now reside.  The home had never been modified for any adaptive purpose, nor had the 2011 Toyota Tundra that he owned at the time.  He had no condition that made operation of any motor vehicle that he used problematic.

### Self-Care and Household Chores
Mr. Miears had no difficulty dressing, feeding himself, or using a toilet prior to the time of his injury and he completed each of these activities independently.  Bathing presented no special challenges for him, and he had no condition that made personal grooming tasks difficult for him to complete.  He prepared about thirty-five percent of the meals that he ate, while his wife prepared the remainder.  Asked how much of the household shopping he had done, he indicated that he had done about thirty percent and his wife had done the other seventy percent.

Housecleaning was a task that Mr. Miears and his wife shared equally.  He reports that he did about seventy percent of the household laundry, while Marian Miears did the remainder.  Removal of garbage from the home was primarily his responsibility, and he removed about ninety percent of it, by his estimation.

Asked about yard work, Mr. Miears indicated that he had done about ninety-five percent of the mowing of his home's lawn using a push mower; his wife did the other five percent of the mowing.  Additionally, Mr. Miears did about ninety-five percent of the weeding of the lawn.  Since the lawn had an underground sprinkler system, there was no need for hand watering.  In the springtime Mr. Miears would prime the system's pump and in the fall he would pull its drain plug.  He paid a local business to service the system each fall.

On the Miears' property are Austrian pine trees, apple trees, blue spruce, cherry trees, and American  buckeyes.  Mr. Miears did about seventy percent of the routine pruning of the trees, and Mrs. Miears did the other thirty percent.  There were no leaves to rake.  The Miears also planted vegetables and flowers on their property, with Mr. Miears doing about seventy percent of the planting and his wife doing the remainder.

In the wintertime Mr. Miears would use an all-terrain vehicle with a snowplow on it to remove snow from his home's driveway.  Additionally, he would use a shovel to remove snow from the house's back patio and from the walkways on the property.  He estimates he did about ninety percent of the snow removal.

When his home's roof was in need of repair, Mr. Miears would repair it by himself.  He also made all necessary repairs to the house's baseboards and doorframes, and he would make minor repairs to its plumbing but pay a plumber to do any more extensive work. When asked who had replaced light bulbs in the house's lighting fixtures, he indicated that this has been his exclusive responsibility.

Marian Miears did about twenty percent of the interior painting of the family home, while Mr. Miears did the other eighty percent.  Since the house's exterior is made of brick and stainless steel siding, no exterior painting of the home is necessary.  However, there is also a detached wooden garage on the property, and Mr. Miears did all painting of its exterior.  Additionally, he would stain the wooden fence of the property every other year.

At the time of his injury, Mr. Miears owned a 2011 Toyota Tundra and his wife owned a 2013 Toyota 4Runner.  Mr. Miears would make minor repairs to each vehicle as necessary, but he and his wife would pay mechanics to change motor oil, rotate tires, and make any major repairs.

***Adaptive Equipment and Supplies***
Mr. Miears did not use any adaptive equipment prior to the time of his injury, nor did he use any special supplies related to a medical condition.

***Supervision and Assistance***
Since he had no disabling condition, Mr. Miears needed no assistance to complete any self-care tasks or instrumental activities of daily living.  He needed no supervision to ensure his safety, either.

***Recreation and Fitness***
A very active individual, Mr. Miears engaged in numerous recreational activities in his free time.  Each year he competed in two sprint triathlons in Park County, and he participated in two or three five- and ten-kilometer runs as well.  He played recreational football for eight weeks each year and recreational softball for seven to eight weeks. During the golf season, he would play golf every two days, and he played tennis twice each week.  A member of a bowling league, he would bowl weekly for the five months of the season, and he played volleyball once each week for seven weeks of the year.

Additionally, Mr. Miears was an avid downhill skier prior to the time of his injury.  He liked to ski on steeper, more challenging runs such as black diamonds and moguls.  In a typical year he would go skiing ten times, either with his family or alone.

Other activities that Mr. Miears enjoyed were camping, barbecuing, hunting, and fishing. Depending on his work schedule, he would go camping from five to ten times per year, usually with his wife.  He would fish while camping, and on about five other occasions per summer he would go fishing at a creek or lake.

Hunting was another of Mr. Miears' favorite activities.  Sometimes he would ride on horseback with other hunters to a specific location and spend several days hunting, while on other occasions he would go hunting alone.  Additionally, he would sometimes take his camper trailer to a mountain locale and stay for a weekend, hunting with others.  A bow hunter, he used a compound bow to hunt elk, deer, and antelope.  The only game that he normally hunted using a shotgun were birds.

Mr. Miears enjoyed barbecues, and on several occasions each year he would host a barbecue at home for his friends and neighbors, or would visit others' homes for a barbecue.  When camping or attending a barbecue he liked to play Polish horseshoes and cornhole with his companions.  Fly-tying and woodworking were two of Mr. Miears' hobbies, and he also made flags and decorative wall hangings.

On four occasions per week Mr. Miears would spend from fifty to ninety minutes exercising with resistance bands.  He also did cardiovascular exercises on a regular basis, following a fifty-minute videotaped routine three times per week.  At the time of his injury he was six feet tall and weighed one hundred fifty-five pounds.

### *Memberships and Volunteer Work*
As of June 2015, Mr. Miears was a member of a recreational football league, a recreational softball league, a bowling league, and a recreational volleyball league.  He answered in the affirmative when asked if he had done any volunteer work, indicating that he had been involved in several different public service programs.  One was Shop with a Cop, a program that he had started in 2013 to help needy children in Park and Bighorn Counties.  Another was Change Attitudes Now (CAN), a role model program for elementary school children.

In addition to his other volunteer work, Mr. Miears was a member of the Wyoming Highway Patrol's peer support team.  As a member of the team, he would provide emotional support to officers involved in shootings, and to their families when necessary. Finally, Mr. Miears would help his wife do yard work for M and M Lawn Care, a business of which Marian Miears was part owner.  He would pull weeds, rake leaves, remove branches from customers' lawns, replace underground sprinkler heads, and do other tasks to help his wife, but he was not paid for any of this work.

### Medical and Rehabilitation Records Reviewed
Records of Mr. Miears' medical treatment and rehabilitation reviewed in the preparation of this report are listed in the appendix beginning on Page 24.

## Pertinent Medical Diagnoses and Treatment History

Following the motor vehicle accident of June 15, 2015, an ambulance crew that had arrived on the scene transported Mr. Miears to West Park Hospital.  Emergency physician Aaron Brown, M.D. made an assessment of his condition that day and in his report recorded the following remarks:

> 28-year-old presenting to the ED, status post MVC head-on collision with a semi-truck.  Positive LOC on scene, but awake, alert and oriented upon EMS arrival.  Patient required extrication due to his leg being pinned.
> On exam, only superficial injuries are apparent.
> Due to mechanism, we'll get CT of the brain and C-spine.
> CTs are negative, no acute injuries.  Superficial abrasions are cleaned and dressed.
> EKG sinus bradycardia and chest x-rays negative.
> Tetanus is up-to-date.
> Patient is ambulatory, bearing full weight, normal gait, no need for extremity x-rays.
> We'll discharge home.
> Patient declines any prescription medications.

Pain in Mr. Miears' back led him to visit West Park Hospital again on the following day.  In an effort to determine the origin of his pain, Craig Edwards, PA-C ordered magnetic resonance imaging of his thoracic spine.  Following completion of the imaging, radiologist Travis Graham, M.D. recorded his findings in a report dated July 19:

> This patient has some areas of endplate irregularity more evident at the mid to lower thoracic spine levels with the overall vertebral body heights maintained. No level of subluxation.
>
> The thoracic spinal cord has a normal caliber, size and signal.
>
> There are early signs of disc disease mainly at mid thoracic spine levels and there is overall a very small right paracentral disc protrusion at T6-7 but no significant central spinal canal narrowing.
>
> No significant paravertebral abnormality appreciated.

According to a report written by orthopedic surgeon Stephen Emery, M.D. on October 1, 2015, Mr. Miears visited Northern Wyoming Surgery Center that day.  Dr. Emery administered to him a "Facet injection, T10-T11, bilateral, under fluoroscopy" in an effort to alleviate ongoing "thoracic pain."

In another report dated October 28, Dr. Emery wrote, "Rodney Miears returns this time to discuss his MRI."  Noting that "the MRI of the thoracic spine does not show any additional abnormalities," the doctor wrote the following plan for Mr. Miears' treatment:

> At the current time, our closest diagnosis for making the patient symptom-free is in the facet/rib/nerve area of T10-T11 on the left.  I would like to try a selective nerve root block at the T10 thoracic nerve.  I have spoken with Dr. Low regarding this.  It is possible that if this injection works, an ablation of this nerve could be arranged with Dr. Ribnik[,] who is a pain management doctor in the southern part of the state who[m] I am familiar with.  Dr. Low has suggested this and see [sic] Dr. Ribnik as well.

Dr. Emery recorded a diagnosis of "M54.6:  Pain in thoracic spine" and gave Mr. Miears written instructions in the performance of exercises to decrease the pain in his upper back.

Twelve days later Mr. Miears visited Northern Wyoming Surgical center for the procedure recommended by Dr. Emery.  Anesthesiologist Bradley Low, M.D. administered to him a "selective nerve root block" in the "Left T10 nerve root" that day.  Dr. Low's report on the procedure includes a diagnosis of "left thoracic foraminal stenosis with radiculopathy."

On December 2, 2015, Dr. Low administered a second "selective nerve root block" to Mr. Miears, on this occasion in the "right T10 nerve root."  The doctor's report identifies "right thoracic foraminal stenosis with radiculopathy" as the indicator for the procedure.

Mr. Miears reported a decrease in pain when he visited Dr. Emery on January 7, 2016.  Dr. Emery described a plan for his return to work in a report on their meeting written that day:

> Rodney Miears returns at this time.  He has had success with both of his selective nerve root blocks in the thoracic region, although the right side was not as quick in relief as the left side.  At the current time, he is not ready to go back to work and I think we should give him another month off.  During that time, he will start increasing his activity with the exercises that I have given him[,] and we will return him to work if he comes to the conclusion that he can return to full duty earlier than a month.  This is certainly…good news[,] since this is the first tool we have used that has significantly improved him.

When Dr. Emery assessed Mr. Miears' condition again on February 4, he noted, "Rodney Miears returns at this time much improved…[in] his back condition.  He is currently doing sit-ups, push-ups, and run[ning] without difficulty."  Regarding Mr. Miears' ability to work, he wrote

> I think that we can return him to work starting 02/08/2016 with no restrictions.  I have explained to him that workers' comp[ensation] will still cover him for exacerbations in thoracic area that I fully expect will happen at some point in time.  He will let us know if he needs further care in this regard.

Dr. Emery urged Mr. Miears to continue doing his upper back exercises and in his report indicated that he was "released to return to full duty with no restrictions."

At the request of the Wyoming Department of Workforce Services, Dr. Emery re-evaluated Mr. Miears' on November 21, 2017 in order to determine the extent of his impairment.  In a report of that date he remarked, "[Mr. Miears] did not have a fracture initially, although he was treated in a TLSO for suspected fracture to the spine.  This was never proven on MRI.  The patient's injury suggested a flexion rotation type injury pattern."  Taking into account the findings of his own examination, Mr. Miears' medical records, and the results of diagnostic studies, Dr. Emery concluded, "Assessment is of thoracic sprain and strain, chronic secondary to motor vehicle accident of 06/15/2015.  Using the AMA guides to evaluation of impairment[,] fourth edition revised, the patient has a whole person impairment of 1%."

On January 17, 2018, Mr. Miears consulted orthopedist Frank Schmidt, M.D. at West Park Orthopedic Specialists for a second opinion on the origin of the ongoing pain in his back.  Dr. Schmidt examined him that day and in his report recorded a diagnosis of "chronic thoracic back pain, M54.6: Pain in thoracic spine."  He continued,

> The patient unfortunately has persistent pain in the mid[-]thoracic region aggravated by prolonged sitting.  His current occupation requires that he do prolonged sitting and the two are not compatible.  The patient also has…had a functional capacity evaluation which rates him at a lower level than…would be required to be maintained as a highway patrolman with the need to do heavy work to address situations.  He has chronic thoracic back pain as a direct result of his motor vehicle accident which occurred in 06/15/2015.  I feel most likely he sustained a significant ligamentous injury in this region, which is giving him local instability, which is aggravated…by extension and sitting straight.  It is my opinion that the patient is not able to perform his occupation as a highway patrolman because of this long-term injury.  I think he will find gainful employment with retraining.  He [is]…interested in teaching and I think he would be very well[-]qualified for that and we would allow him multiple opportunity [sic] to change position and teach in standing position as well.  He will continue his follow[-]up and treatment through Dr. Emery.  If I can be of any further assistance, they will contact me.

Mr. Miears was evaluated by mental health professional Ashley Skates, MSW, LCSW on September 18, 2019 at her office in Cody.  Her primary diagnosis was "Post-traumatic stress disorder, unspecified."  Her treatment protocol included the planned use of Eye Movement, Desensitization and Reprocessing (EMDR) as well as cognitive behavior therapy.

### Current Functioning
Numerous changes in Mr. Miears' functioning appeared following his injury on June 15, 2015 and have affected his life in various ways.  The four subsections below detail these

issues, with the first focusing on physical changes that have occurred and the second and third describing cognitive and emotional changes respectively.  The fourth section describes how these changes have affected Mr. Miears' way of life.

**Physical**
*Pain*
Back
A day or two after the June 15 accident, Mr. Miears began to experience an ache in his mid- and lower back, and he reports that pain has affected this area continually ever since that time.  It affects the right side of his back exclusively and increases whenever he rotates his torso or spends longer than about an hour seated.  At present, its severity corresponds to three on a zero-to-ten scale for about fifty percent of the time and to four for the other fifty percent of the time.  To alleviate pain in his back he will shift his weight when standing and when sitting, and he also does exercises every few hours of the day to stretch the muscles in his back.  He uses both Tylenol or Aleve to keep the pain to a minimum.

In addition to the ache in his back, Mr. Miears experiences intermittent sharp, "knife-like" painful spasms in the same area that radiate three to four inches rightward from his thoracic spine.  Such pain affects his back whenever he sits continuously for two hours or longer.  The spasms continue for at least two days, and before he was retired from highway patrol duties he would experience such pain on a weekly basis.  At present, he experiences painful  spasms once every five to six weeks.  The pain comes with rotation of the torso, and for this reason he avoids making this movement when he can.  When he cannot avoid it, the pain will increase until his torso is again in neutral position.  Additionally, he reports that the sharp painful spasms also cause him to become short of breath for thirty to sixty seconds at a time.

Using a zero-to-ten scale, Mr. Miears indicated that the sharp pain in his back corresponds to seven in severity for about fifteen percent of the time.  For another five percent of the time it is slightly less intense, corresponding to his rating of six.  He experiences no such pain for about eighty percent of the time.  When sharp pain affects his back, he will lie recumbent when he has the opportunity, as he has found that this reduces it.  The only way he has of preventing painful spasms is to limit the amount of time that he spends seated.

Head
On approximately every other day Mr. Miears experiences pain in the back of his head.  It affects the entire lower right quadrant and lasts from a minute to five minutes.  Although initially sharp, the pain diminishes to an ache over the short period of time that it affects him.  He has either one or two headaches on days when he experiences such pain, but he does not know the origin of the pain.  At its most intense, it corresponds to his rating of six on a zero-to-ten scale and then diminishes to a severity that he rates either four or three.  He has found that closing his eyes has the effect of reducing it.

<u>Right Knee</u>
Another area in which Mr. Miears experiences intermittent pain is his right knee.  About once every six to eight weeks he will feel a deep ache in the joint that radiates rightward.  Although he does not know the origin of this pain, he has found that it increases when he bears weight or kneels.  He has fallen on more than five occasions since the time of his injury, always when kneeling and simultaneously bearing weight.  The last of these occurred more than a year ago, as he now purposely avoids kneeling with his right lower extremity.

For about ten percent of the time, the severity of the pain in Mr. Miears' knee corresponds to his rating of five on a zero-to-ten scale.  It corresponds to three for about fifteen percent of the time, and for the remaining seventy-five percent of the time the knee is pain-free (zero).  When asked what he does to alleviate pain in his knee, he indicated that he will cease weightbearing and keep the knee straight.  In thirty minutes to an hour, the joint will no longer ache.  Because he does not know what causes pain in his knee, there is nothing he can do to prevent it.

<u>Right Wrist</u>
As before, Mr. Miears sometimes experiences pain in his right wrist when he uses his right hand to remove a lid from a jar.  The pain is still sharp, and it affects him about once every six months.  It is slightly more severe than it was before the time of his injury, corresponding at times to five on a zero-to-ten scale.  To alleviate the pain he will cease using his right hand and will take a dose of Tylenol or Aleve.  Asked how he seeks to prevent pain in his wrist, he indicated that he will either use his other hand to open jars or else ask someone else to do it for him.

*Sensory Functioning, Balance, and Coordination*
Mr. Miears' vision and hearing remain functional, as do his senses of smell and taste.  The only change in tactile ability that he has experienced is a temporary loss of sensation in his right upper extremity that occurs about once every three weeks during the wintertime when the outdoor temperature is twenty degrees or lower.  During the remainder of the year he experiences this loss of sensation only once.  At such times, numbness and tingling affect an area extending from his right elbow to the hand, along with his ring finger, middle finger and little finger.  While he can feel pain in the affected area, he does not have normal sensation in it for a period of fifteen to twenty minutes.

As before, Mr. Miears has no difficulty directing the movements of his extremities, and the only occasions on which he has experienced a balance deficit have been when he has bent his right knee to kneel while bearing weight.  Although he answered in the negative when asked if he experienced any vertigo, he indicated that he does experience some dizziness now.  About once every three weeks he feels inexplicably dizzy for a second or two, sometimes while walking and sometimes when he has a headache.

**Cardiopulmonary Functioning**
When experiencing a painful spasm in his back, Mr. Miears becomes short of breath, and

the length of time that the dyspnea lasts depends on the severity of the pain.  It can last for up to sixty seconds when he experiences pain corresponding to six on a zero-to-ten scale, and it lasts for about thirty seconds when the pain is less severe.

Mr. Miears answered in the negative when asked if he experiences any asthma now, and he gave the same answer when asked if he had developed any allergies.  His cholesterol levels remain healthy, and he has no cardiovascular problems.

### Urinary Tract
To date, the injuries that Mr. Miears sustained in the June 2015 accident have had no effect on his bladder function.  He experiences no urinary urgency and no bladder accidents.

### Gastrointestinal Functioning
As before, Mr. Miears' bowel movements are regular and he experiences no bowel incontinence.  He answered in the negative when asked if he experiences any dysphagia or gastroesophageal reflux.

### Medications
To keep his pain to a minimum, Mr. Miears uses both Tylenol and Aleve, taking one of these medications on one day and the other medication on the next.  His regimen of Tylenol is 1,000 milligrams once daily, and his regimen of Aleve is 440 milligrams, also twice daily.  Neither medication has any side effects that affect him.  Additionally, he takes 4,500 milligrams of glucosamine DS each day for pain management.

Sometime after his injury Mr. Miears began taking fish oil capsules, which he has been led to believe aid healing.  He currently takes 1,200 milligrams of fish oil per day.

### Sexual Functioning
Because of Mr. Miears' chronic pain, he and his wife have sexual relations less often now than they formerly did.

### Sleep
Since his return to work, Mr. Miears has worked day shifts exclusively.  He now retires to bed for the night at 9:30 p.m. after taking a dose either Tylenol or Aleve, and he falls asleep twenty to thirty minutes later.  Pain in his back awakens him on about two nights per week, and when this occurs he will usually reposition himself in bed and fall asleep again fifteen minutes later.  About once every two weeks the pain is severe enough that he must rise and stretch his muscles to reduce it before returning to bed.  As before, his sleep is undisturbed by nightmares.

Mr. Miears now rises for the day at 5:00 a.m., and he reports that his sleep is restorative.  However, he experiences drowsiness that lasts for five to ten minutes at a time once or twice per week.  When this occurs, he will eat a protein bar or granola bar and will drink

water to combat drowsiness.  He still does not take naps, and in a typical twenty-four-hour period he sleeps from seven to eight hours.

### Motor Activities

Pain in Mr. Miears' back now limits his capacity for numerous motor activities.  He can no longer lift or carry a load of more than fifty pounds, and when standing he must shift his body weight from one leg to the other or else place most of it on his left leg to alleviate pain in his back.  Shifting his weight in this way, he can stand for about forty-five minutes before the pain becomes severe enough that he must sit or walk.  If he does not keep shifting his weight, he can stand for only five to ten minutes at a time.

If ambulating on level terrain and not carrying anything, Mr. Miears can walk a distance of one mile before the pain in his back begins to increase.  Hiking in the mountains while carrying a fifteen-pound backpack, he can ambulate for only about thirty minutes before he begins to experience painful spasms.  However, he can hike for up to an hour with a backpack before this occurs if the incline is very gradual.

Regarding his capacity for sitting, Mr. Miears reports that he can sit for about ninety minutes before the ache in his back become so intense that he must alter his posture.  Sometimes he will lift the right side of his body slightly upward and place more of his weight on his left buttock.  This reduces the pain for a period of five to ten minutes, but he will then have to rise and walk.  After five minutes of walking the pain is again at a tolerable level.  If he seats himself again after just five minutes of walking, however, he will experience another flare-up of pain in about forty-five minutes' time.

During periods of time when he is experiencing painful spasms in his back, Mr. Miears feels more severe pain whenever he reaches to the left.  However, reaching causes no increase in his back pain at other times.  His grip is functional at most times, but not when he is experiencing numbness in his right upper extremity, and he does not attempt to grasp objects with the right hand at such times.  Additionally, he knows that he will not be able to grasp an object with his right hand when his wrist is in pain after he has attempted to open a jar.

Mr. Miears reports having a smaller range of motion in his right knee than he used to have, but this reduction affects the knee only when he is bearing weight.  If he is experiencing pain in his right knee, he will avoid bending it to kneel; he has no difficulty bending the left knee to kneel.  When asked if he were able to crouch, he indicated that he can do it for only thirty seconds at a time before pain in his back beings to increase and he starts to feel pain in his right knee.

Bending at the waist can cause significantly greater pain in Mr. Miears' back.  Although he can bend downward to brush dust from his pants, he must bend at the knees now to retrieve a pencil that has fallen to the floor.  Rotation of his torso invariably produces painful spasms in his mid-back.

### Environmental Tolerances

Although his injuries have not affected his tolerance for heat, Mr. Miears has significantly less tolerance for cold now than he formerly had.  He reports that the pain in his back intensifies whenever he is exposed to a sub-freezing environment.  Consequently, he wears more layers of clothing now in the wintertime than he did before the time of his injury.  As before, a rapid change in the temperature of his surroundings has no adverse effect on his functioning, nor does moisture or humidity in his environment.

When traveling by air, Mr. Miears feels a more intense ache in his back if the aircraft encounters turbulence, and he may experience painful spasms at such times as well.  His tolerances for loud noise and for bright light are unchanged, and he reports no change in his tolerances for fumes, strong odors, dust, or chemical agents in his environment.  When he must do work at an unprotected height, he works more slowly and carefully than he formerly did in order to prevent painful spasms in his back.

### Integumentary System

As before, Mr. Miears' skin does not bruise easily, and he is not more susceptible to skin rashes or dermal ulcers than he was before the time of his injury.

### Other

A typical week in Mr. Miears' life consists of three "good days" and four "bad days."  On good days he has less pain than on others, and he is more optimistic and more patient with his sons than on "bad" days.  He feels needed and important on such days, while on the four "bad days" of his week he is depressed about his functional deficits and is in more pain than on "good" days.

Although he is less active than he used to be, Mr. Miears reports no change in his physique and no inexplicable weight gain or loss.  He answered in the negative when asked if he experienced any unusual fatigue now.  One of his teeth was chipped in the June 2015 accident, and not long afterward he had it repaired.

### Cognitive

Concentration is more of a challenge for Mr. Miears now than it used to be.  Once or twice per week he has difficulty maintaining attention while writing a report for work.  On such days he will lose his train of thought and daydream several times.  When he realizes that he is doing this, he will tell himself that he cannot be lazy and that he can complete the report on time.  Additionally, he will begin to daydream several times each week when his wife is speaking to him.  At such times he may not realize that he is doing this until he hears his wife ask, "Rodney, are you there?  Are you listening to me?"  At other times his wife must move nearer to him to gain his attention.

Mr. Miears processes information more slowly now than he did before the time of his injury.  This change is evident when he is writing a report or a request for additional funds for the Tow and Recovery Program.  He finds that he cannot think of examples to

support the request as quickly as he knows that he would have before he was injured, had he been part of the program at that time. Additionally, recalling a word that he wishes to use or the name of a campsite or creek takes longer now than it formerly did. He describes his current speed of mental processing as "medium."

While his working memory appears to be unchanged, Mr. Miears experiences deficits of both short-term and long-term memory now. When his wife tells him about an activity that she has planned for the weekend, he must enter a memorandum about it in his smartphone or else he will not remember it. About half the time when he is given information orally, he is unable to remember it on the following day. If his wife tells him, for example, about six activities that she has planned for the week, he can typically recall only two of them.

Additionally, Mr. Miears' recall of information that he learned as part of his police training is not as good as it used to be. If someone were to ask him to recite the text of a statute, remembering the words would take longer than it formerly would have, or he might recite the text of a different law by mistake. After his return to work following the June 2015 accident, he found that his recall of a statute's text was incorrect on about one occasion in three. When he teaches classes for peace officers now, he will sometimes refrain from presenting information that he used to include in his lessons because he does not trust the accuracy of his recall.

When asked if he can recall the proper measures to take in emergency situations, Mr. Miears answered in the affirmative. He gave the same answer when asked if he continues to take appropriate safety precautions.

As before, Mr. Miears is disinclined to make decisions on impulse. He has no difficulty initiating activity or solving problems, and his sense of the passage of time remains accurate. His ability to make plans has been adversely affected by his mnemonic deficit. Because he forgets that he has been assigned a task, he will leave it undone, and reports having such difficulty both at work and at home. Consequently, he has adopted the habit of creating memoranda to which he can refer. His capacity for multi-tasking has diminished, and reports that he can keep track of only two or three tasks at a time now.

Mr. Miears now experiences word-finding difficulty, both in conversation and when writing. When speaking he will be unable to think of a word that he wishes to use and will substitute for it a word that does not have the same meaning. The frequency at which this occurs varies from three times per week to daily, and it has led to miscommunication. He finds it embarrassing, particularly when he makes such mistakes while teaching a class.

Word-finding difficulty also affects Mr. Miears when he is writing. While typing, he believes that his writing is satisfactory, but when he re-reads what he has written, he discovers that he has misused words, mistakenly thinking that they conveyed the meaning that he intended.

Regarding his ability to follow directions, Mr. Miears reports that he can follow spoken directions of up to three steps.  When given such directions he will repeat them to himself mentally several times.  If given directions of more than three steps he must write them down or else he will forget one or more of them.  He reports no difficulty following written directions, provided a record of them is available to him.  As before, he has no difficulty using a telephone or computer.

Although Mr. Miears has no difficulty reading or responding to mail that he receives, his wife pays all of the household bills now, as he might forget to pay them.  Additionally, his wife now does all updating of their financial records.

**Emotional/Behavioral**

About a year ago, Mr. Miears began to experience depression when he realized that he would not regain his former functional abilities.  This realization came when he was medically retired from highway patrol duties, and the loss of this job has contributed to his depression.  Additionally, he is depressed that pain in his back prevents him from playing golf with his friends, going on weekend hiking trips, and competing in athletic tournaments.  He worries about the stability of his marriage, particularly because of the negative effect of his pain on his sexual relationship with his wife.

Regarding his self-image, Mr. Miears reports that on the four "bad days" of a typical week in his life he feels worthless as a husband and father and he is hopeless and sad.  However, his self-image is less negative on the three "good days" of the week.  About once every two months he will weep in solitude, saddened by his pain and by the loss of his job as a highway patrolman, an occupation that he loved.  He still does not cry or laugh at inappropriate times, however.  When asked if he had adjusted psychologically to his disabling condition, he indicated that he had "not really" adjusted, as he remains depressed about it.

In addition to depression, Mr. Miears now experiences anxiety.  Approximately twice per week he will worry obsessively about his family's financial security and about the future of his marriage.  He reports that his stomach aches at such times.  At the beginning of September he started seeing a licensed counselor on a weekly basis to address his anxiety and depression.

While he is not irritable, Mr. Miears is less patient on days when he is depressed than on other days.  If his older son misbehaves on such a day, he will scold him more sternly than he would on a "good day."  Afterward, he reflects on what he has done and when he considers that his son is only four years old, he realizes that he should have shown more patience and apologizes to him.  Additionally, he is easily frustrated on approximately four days per week when he is depressed.  Although listening to customer complaints about towing services is part of his job, he becomes frustrated and angry as well as irritable with customers on such days.

Another difficulty that Mr. Miears has on "bad" days is less tolerance for stress than he has on other days. When the pain in his back is relatively severe and he is depressed, he finds that he is unable to concentrate adequately on his job duties. If he must investigate a towing company, he must telephone others and ask for relevant information, but he finds that he has no desire to talk to people on such days. He is short-tempered with the persons with whom he speaks, and when his telephone rings, he may not answer it. If the caller leaves him a voicemail message, he will wait until he is less distressed to return the call. Determining the relative urgency of tasks that he must complete is difficulty for him when he is under stress, and he is less productive at work on such days than he is on "good" ones.

As before, Mr. Miears feels no anxiety in crowds and he does not isolate himself socially. Although he describes his marriage as "fairly good," he often feels "worthless" as a husband, particularly on days when his symptoms are relatively severe. He continues to have several close friendships and cordial relationships with his siblings.

Mr. Miears has given up chewing tobacco. He has increased his consumption of alcoholic beverages since he was medically retired from highway patrol officer position, and he now drinks on four or five occasions per week, consuming from two to four servings of beer each time. As before, he does not use illegal drugs, nor does he gamble, and he has received no treatment for chemical dependency.

**Way of Life**
*Housing and Transportation*
The Miears house remains unmodified for adaptive purposes. When asked if he had any difficulty accessing any part of it, Mr. Miears indicated that he has not attempted to access its attic since the time of his injury. He explained that to do this he would have to use a ladder and would have to pull his entire body weight onto the attic floor once he reached the top rung; he does not know if he would be successful in such an endeavor.

Mr. Miears' GMC Sierra has heated seats, and he reports that this feature helps to minimize pain in his back when he drives. Nevertheless, he cannot drive for longer than thirty minutes at a time without experiencing an increase in back pain. Sometime after his injury he purchased a new trailer to take on camping trips. The mattress in the trailer's bed is of a better quality than the one in his old trailer and this, too, helps to minimize pain in his back when he sleeps.

*Self-Care and Household Chores*
Because the pain in his back increases when he bends at the waist, Mr. Miears now uses a stepstool to don socks and shoes. Before the time of his injury he would wear cowboy boots when at home. After the subject accident, he found that he experienced more intense pain in his back when wearing them, so he now wears tennis shoes instead. He remains able to dress and undress himself, and his injuries have not affected his ability to bathe, use a toilet, feed himself, or perform personal grooming tasks.

Performance of household chores causes the pain in Mr. Miears' back to increase, and for this reason his wife does a greater share of these than she formerly did. At present, Marian Miears does about ninety percent of the routine household shopping, while Mr. Miears does the remainder. She also does about eighty percent of the routine cleaning of their home and Mr. Miears does the other twenty percent. They do approximately equal amounts of laundry now. Asked how much of the household garbage he removes from the home, Mr. Miears indicated that he removes about seventy percent and his wife removes the rest of it.

Since Mrs. Miears now has to do more of the household chores than she did before the time of the June 2015 accident, Mr. Miears has assumed more responsibility for preparation of the family's meals. He now makes about seventy percent of the meals that they eat, while his wife prepares only about thirty percent.

Not long after Mr. Miears' injury, he and his wife purchased a riding lawn mower that they each use to mow their home's lawn. Mrs. Miears does about forty percent of the mowing, and Mr. Miears does the other sixty percent. The lawn is still watered by an underground sprinkler system that Mr. Miears starts in the spring and drains in the fall. Before the time of his injury Mr. Miears did seventy percent of the weeding of their lawn; now he does only about twenty percent, while his wife does the remainder.

On the Miears' property is a small garden where carrots, tomatoes, basil, and flowers grow. Mr. Miears helps his wife with planting, performing tasks that do not cause him additional pain, but his wife does all hand-watering of the garden. Pruning of the trees on their property has not been necessary since the time of Mr. Miears' injury, nor has trimming of the shrubbery. Mr. Miears believes that he will hire others to perform these tasks once they become necessary.

Although he still uses his all-terrain vehicle with a snow plow to remove snow from his home's driveway, Mr. Miears does somewhat less of this work than he formerly did. By his estimate, he removes about seventy percent of the snow now with the ATV, while his wife removes the other thirty percent. He can still use a shovel to remove light snow from him home's patio and from walkways on the property, but his wife will shovel these areas now after a heavier snowfall.

The roof of the Miears' home has needed no repair since the time of Mr. Miears' injury. If it were in need of any significant repair, Mr. Miears would either ask a friend to fix it or else hire someone to do it. However, if a shingle replacement were all that were necessary, he would do it himself carefully and slowly. Regarding repair of the home's baseboards and doorframes, Mr. Miears indicated that he would hire someone to do such work now, and he would hire a plumber to make any repairs to the house's plumbing.

Painting of the Miears home's interiors has not yet been necessary, as the house was built only seven years ago. Were it necessary, Mr. Miears and his wife would share the work equally. After the 2015 accident they purchased a paint sprayer to make painting easier

for Mr. Miears.  They have both used the sprayer to paint their detached garage, with each of them doing about half the work.  Mr. Miears continues to replace light bulbs in the table lamps in his home, but since the time of his injury he has not replaced a bulb in any overhead light fixture.  If replacement of a bulb in an overhead lamp were necessary, he would have to use a ladder and would need his wife's assistance to replace it.

Mr. Miears no longer attempts to make any repairs to his motor vehicle.  He pays mechanics to make all minor and major repairs to the Sierra, change its motor oil, and rotate its tires.

### Adaptive Equipment and Supplies
Since the time of his injury, Mr. Miears has had to purchase a number of products to accommodate his ongoing symptoms and functional deficits.  One of these was a new bed, as the bed on which he formerly slept did not provide adequate support for this back.  Sleeping on the old bed, pain in his back would awaken him on three or four occasions every night.  Since he began using the new one, back pain has awakened him only once per night.

Another device that Mr. Miears purchased after the time of his injury was a riding lawn mower with a mulcher.  The mulching feature eliminates the need to bag cut grass, and thereby allows him to avoid the greater pain in his back that comes with bending at the waist.

For his hiking trips, Mr. Miears purchased a new backpack after his injury.  It is smaller than the backpack that he used to use when hiking and its lighter weight helps to minimize pressure on his back.  Sometime after the June 2015 accident he discovered that hunting with a compound bow caused greater pain in his back, so he purchased a crossbow that he now uses for hunting.

Once Mr. Miears began working as a Tow and Recovery Program Coordinator, the Highway Patrol provided him with an adjustable desk that can be lowered or raised, permitting work either in a seated or standing position.  Additionally, the Highway Patrol purchased a perch chair for him in early September.

### Supervision and Assistance
As before, Mr. Miears needs no supervision to ensure his safety.  At least once each month he needs another person to complete some task for him that would be painful and/or dangerous for him to do now as a result of his injury.  An example that he gave was his need for assistance from one of his co-workers earlier this year to unload a new irrigation pump from his truck.  He estimates that he needs at least one hour of assistance per month.

### Recreation and Fitness
The pain in Mr. Miears' back now prevents him from running competitively, as he formerly did.  He now runs for fitness twice per month, covering a distance of one mile to

three miles, depending on the amount of pain that he feels.  His ongoing symptoms have also forced him to give up playing football, softball, and volleyball, and he is no longer a member of a bowling league.  He has gone bowling twice during the last year, using a lighter-weight ball than he formerly used in order to minimize the strain on his back.  Nevertheless, he finds that the rotation of his trunk causes greater pain in his back when he bowls.

Since the time of his injury, Mr. Miears has played golf on six or seven occasions.  On the first two of these, pain in his back prevented him from finishing a nine-hole course.  He then modified his swing so that it was less pain-producing.  Before the time of his injury he could hit a golf ball a distance of two hundred yards using a 9 iron.  Using a slower swing now, he can no longer hit the ball even one hundred thirty yards.  No longer able to play tennis competitively, he has played the game with his wife once or twice since the time of the June 2015 accident simply for exercise.  He reports that he has gone skiing five times during the last three years, always with his family.  In order to prevent additional injury, he now skis on groomed runs only.

Asked if he does any fishing now, Mr. Miears indicated that he fishes more frequently now than he did before the time of his injury.  He now fishes twice each week, either at a creek or at a lake.  Hunting is more problematic for him now than it used to be.  On one weekend per year he may take an overnight hunting trip, sleeping either in a camper or a tent.  Either his wife or a friend will accompany him on such a trip, as he never takes one alone.  After the time of his injury he found that using a compound bow for hunting caused greater pain in his back.  For this reason, he now hunts using a crossbow.

Twice per year Mr. Miears will go hunting close to his home, driving his truck to a trailhead or a piece of property owned by the state or by friends.  He will then hunt on foot, walking more slowly now than he formerly did, and stopping periodically to stretch the muscles in his back to keep pain to a minimum.  The pain in his back does not increase significantly if he walks a distance of only two miles.  On three or four occasions he has walked a distance of five miles and experienced an unusual flare-up of pain.

Mr. Miears reports that he hunts mostly antelope, deer, and birds now.  Elk hunting is normally done on horseback, as it requires more stamina than does hunting other game.  However, Mr. Miears very seldom rides a horse now when hunting, and when he does, it is only to cross a river when he has no waders.  As he explained, the jarring of his body when he rides on a saddle causes the ache in his back to intensify.  He hunts for elk only once per year now, and when he does he walks next to his horse, with the horse bearing the weight of his hunting gear.  Since the time of his injury he has used a shotgun only once, and he found that the recoil caused more intense pain in his back.

About two years ago Mr. Miears purchased a Polaris RZR off-road vehicle for recreation.  He drives it about four times per week in the summertime, and he has used it for hunting on a groomed trail in the McCullough Peaks.  As before, he enjoys fly-tying and

woodworking, although he now needs assistance to move some of the larger wooden objects that he makes.

The exercises that Mr. Miears formerly did for fitness cause too much pain in his back now for him to perform.  However, he has purchased an elliptical exercise machine that he now uses for twenty to thirty minutes at a time on three or four days per week.  Although the pain in his mid-back does increase during such periods, he does not experience spasms of sharp pain when using the elliptical machine.  He reports his current body weight as one hundred sixty pounds, and he remains six feet tall.

### *Memberships and Volunteer Work*
Because he no can no longer play sports competitively, Mr. Miears is not member of any athletic leagues now.  He has continued his volunteer work with the Shop with a Cop program and with Change Attitudes Now, and he remains part of the Highway Patrol's peer support team.

Not long after the June 2015 accident, Mr. Miears' wife sold M and M Lawn Care.  Her decision to sell the business resulted from his disability, as she had to devote too much time to housework to operate the business any longer.

## Summary

As a result of injuries sustained in a motor vehicle accident on June 15, 2015, Rodney Miears now experiences numerous debilitating symptoms on a regular basis.  These include intermittent right knee and head pain, chronic pain as well as intermittent sharp pain in his mid-back, pain-related sleep disruption, reduced cognitive abilities, mood disruption as well as anxiety.  He has experienced a significant reduction in functional abilities due to these issues.

All information presented in this report is current as of October 2, 2019.  Should any additional pertinent information become available, or if any information not previously taken into account comes to light, I reserve the right to write a supplement report.

Respectfully submitted,

Reg Gibbs, MS
Certified Rehabilitation Counselor
Licensed Clinical Professional Counselor
Certified Brain Injury Specialist
Certified Life Care Planner
Fellow, International Academy of Life Care Planners

# Appendix

## <u>Medical and Rehabilitation Records Reviewed</u>

**Alliance Christian Counseling, LLC**
Ashley Skates, MSW, LCSW
- Evaluation, September 18, 2019

**Alternative Specialties, L.L.C.**
Janet MacLennan, O.T.R., C.L.T.
- Progress report, January 4, 2016

**Big Horn Basin Bone & Joint, L.L.C.**
Stephen Emery, M.D.
- Progress report, October 28, 2015
- Progress report, January 7, 2016
- Progress report, February 4, 2016

**Human Performance Center**
Troy M. Fulton, M.S., P.T.
- Functional capacity evaluation, November 14, 2017
- Letter, November 14, 2017

**Kalkowski Chiropractic Center**
Vincent J. Kalkowski, D.C.
- Progress reports, July 28 and 29, 2015
- Progress reports, August 3, 6, 10, 17,  24 and 31, 2015
- Progress reports, September 8, 14, and 22, 2015
- Progress reports, October 5 and 19, 2015
- Progress reports, November 5, 16, 24, and 30, 2015
- Progress reports, December 10 and 23, 2015
- Progress reports, January 5 and 20, 2016
- Progress reports, February 3 and 23, 2016
- Progress report, March 16, 2016
- Progress reports, April 4 and 25, 2016
- Progress report, May 16, 2016
- Progress reports, June 14 and 27, 2016
- Progress report, July 18, 2016
- Progress reports, August 9 and 31, 2016
- Progress report, September 21, 2016
- Progress report, October 12, 2016
- Progress reports, November 7 and 29, 2016
- Progress report, December 12, 2016
- Progress report, January 2, 2017

- Progress reports, February 6 and 28, 2017
- Progress report, March 23, 2017
- Progress report, April 17, 2017
- Progress reports, May 8 and 31, 2017
- Progress report, June 21, 2017
- Progress report, July 12, 2017
- Progress reports, August 7 and 23, 2017
- Progress reports, September 11 and 26, 2017
- Progress report, October 17, 2017
- Progress report, November 7, 2017
- Progress report, December 6, 2017
- Handwritten progress reports, January 2 and 29, 2018
- Progress report, February 19, 2018
- Progress report, March 12, 2018
- Progress reports, April 9 and 30, 2018
- Progress report, May 21, 2018
- Progress reports, June 13 and 26, 2018
- Progress report, July 10, 2018
- Progress reports, August 6 and 23, 2018
- Progress report, September 19, 2018
- Progress reports, October 8 and 22, 2018
- Progress report, November 12, 2018
- Progress reports, December 5 and 20, 2018
- Progress reports, January 10, 29, and 30, 2019
- Progress report, February 19, 2018

**Northern Wyoming Surgical Center**
Stephen Emery, M.D.
- Operative report, October 1, 2015

Bradley Low, D.O.
- Procedure report, November 9, 2015
- Procedure report, December 2, 2015

**West Park Hospital**
Aaron Brown, M.D.
- Emergency room report, June 15, 2015

Travis S. Graham, M.D.
- Radiological reports (three), June 15, 2015
- Radiological report, July 16, 2015

Frank  Schmidt, M.D. and Jaclyn Ryan, P.A.-C.
- Evaluation, January 17, 2018

**West Park Orthopedic Specialists**
Stephen Emery, M.D.
- Progress report, November 6, 2017
- Impairment rating, November 21, 2017
- Fit for duty medical assessment - Wyoming Highway Patrol, November 17, 2018

**<u>Other Records Reviewed</u>**
**Big Horn Basin Bone & Joint, L.L.C.**
- Reports of various telephone conversations

**Managed Medical Review Organization**
- Disability application instruction documents, undated
- Physician's report, signed by Stephen Emery, M.D. on January 17, 2018
- Physician's report, signed by Frank H. Schmidt, M.D. on January 30, 2018

**Rodney I. Miears and Marian F. Miears**
- 1040 U.S. individual income tax return, 2015
- 1040 U.S. individual income tax return, 2016
- 1040 U.S. individual income tax return, 2017
- 1040 U.S. individual income tax return, 2018

**Northern Wyoming Surgical Center**
- Various nursing notes

**State of Wyoming**
- W2 wage and tax statement of Rodney I. Miears, 2015
- W2 wage and tax statement of Rodney I. Miears, 2016
- W2 wage and tax statement of Rodney I. Miears, 2017
- W2 wage and tax statement of Rodney I. Miears, 2018

**State of Wyoming Department of Transportation**
- Employee performance evaluation form, October 2016 to September 2017
- Form 1099-R, 2018
- Training history report, July 24, 2019

**WATRS Next Generation**
- Patient care report, June 15, 2015

**West Park Hospital District**
- Various nursing flow sheets
- Various nursing notes

**Wyoming Community Development Authority**
- Mortgage interest statement, 2014
- Mortgage interest statement, 2015
- Mortgage interest statement, 2016
- Mortgage interest statement, 2017

**Wyoming Workers' Compensation Division**
- Chiropractic patient exam/re-exam form, October 2, 2015
- Chiropractic patient exam/re-exam form, December 5, 2016
- Health care provider supportive care request, signed by Vincent J. Kalkowski, D.C., on December 27, 2017

<u>**Earlier Records**</u>
**Kalkowski Chiropractic Center**
Vincent J. Kalkowski, D.C.
- Handwritten progress reports, September 8 and 10, 2014

**Rodney I. Miears and Marian F. Miears**
- 1040 U.S. individual income tax return, 2012
- 1040 U.S. individual income tax return, 2013
- 1040 U.S. individual income tax return, 2014

**State of Wyoming**
- W2 wage and tax statement of Rodney I. Miears, 2010
- W2 wage and tax statement of Rodney I. Miears, 2011
- W2 wage and tax statement of Rodney I. Miears, 2012
- W2 wage and tax statement of Rodney I. Miears, 2013
- W2 wage and tax statement of Rodney I. Miears, 2014

**Wyoming Community Development Authority**
- Mortgage interest statement, 2014

Also reviewed were various handwritten physician orders, progress notes, and referrals authored by providers named above, along with patient questionnaires, treatment consent forms, and signed releases of medical information.  Various admission and discharge documentation related to this case was also examined.



ROCKY MOUNTAIN REHAB PC

**Curriculum Vitae for Reg L. Gibbs, MS**
P.O. Box 20253
Billings, Montana 59104
406-259-7495
rgibbs@rmrehab.com

**Education**

| | |
|---|---|
| Eastern Montana College | Montana State University-Billings |
| Degree: Bachelor of Science, May 1992 | Degree: Master of Science, May 1994 |
| Major: Psychology (cum laude) | Major: Rehabilitation Counseling (cum laude) |

**Certification & Licensure**
- Certified Rehabilitation Counselor through the Commission on Rehabilitation Counselor Certification, Rolling Meadows, Illinois, October 29, 1994 to date, Certificate No. 31978
- Licensed Clinical Professional Counselor through the State of Montana, June 11, 1999 to date, License No. 879
- Certified Brain Injury Specialist through the American Academy for the Certification of Brain Injury Specialists, May 16, 2001 to date, Certificate No. 285
- Certified Life Care Planner through the Commission on Health Care Certification, April 30, 2008 to date, Certificate No. 0987
- Fellow, International Academy of Life Care Planners, July 6, 2016 to date

**Other Professional Credentials**
Clinician Rater Certification, Rehabilitation (FIM/IADL Comorbid), Medirisk Formations Clinical Outcomes System, September 1, 1998 to October 13, 2000

**Professional Experience – Present**
President, Rocky Mountain Rehab, P.C., Billings, Montana, October 2000 to date
- Vocational Rehabilitation Counselor, Life Care Planner, Expert Witness, Medical Case Manager
- Administrator, State of Montana Extended Employment program
- Administrator, State of North Dakota Extended Services program
- Statewide Case Manager for Montana, Neuro Community Care/Wounded Warrior Project

President, Brightsun Technologies, Inc., Billings, Montana, January 1989 to date
- Creator of rehabilitation management software, including FormPro (life care planning) and Access Choice (administrative data)

**Professional Experience – Present** *continued*

Instructor, Institute of Rehabilitation Education and Training, Life Care Planning Program, Newberry, Florida, April 2016 to present

CEO, InQuis Global, LLC, Charleston, South Carolina, September 1, 2016 to date

Member, City of Billings Council (Mayor appointment), February 12, 2018 to date

**Professional Experience – Previous**

Rocky Mountain Rehab, P.C., Billings, Montana
- Database Administrator, State of Idaho Extended Employment program (2004 to 2016)
- Vocational Expert, Social Security Administration (2002 to 2009)

Adjunct Professor, University of Florida Department of Behavioral Science and Community Health, College of Public Health and Health Professions, Life Care Planning Program, Gainesville, Florida, November 2015 to June 2016

Member, Graduate Faculty (part-time), Montana State University-Billings College of Allied Health Professions, Rehabilitation and Mental Health Master's Degree Program, Billings, Montana, September 1998 to December 2011 & January 2013 to May 2014.  Courses taught include:
- REHA 215, Medical Aspects of Disability
- REHA 501, Principles of Social Rehabilitation and Related Services (two semesters)
- REHA 502, Individual and Family Adjustment to Disability (two semesters)
- REHA 504, Occupational Information and Community Resources
- REHA 515, Medical Aspects of Disability
- REHA 520, Group and Individual Evaluation
- REHA 525, Placement (four semesters)
- REHA 593, DSM-IV for Rehabilitation Counseling (two semesters)
- Field Experience Supervisor, undergraduate and graduate students (two semesters)

Outpatient Case Manager, St. Vincent Hospital, Billings, Montana, August 1998 to October 2000
- Case Manager, Headway Brain Injury Program and Developmental Educational Assessment Program
- Rehabilitation Counselor, Headway clients

Vocational Rehabilitation Counselor, Montana Department of Public Health and Human Services – Billings District Office, Billings, Montana, November 1994 to August 1998
- Coordinator, Job Training Partnership Act
- Liaison, Crow Tribe Disability Office
- Liaison, St. Vincent Hospital

**Published Articles**

Smith, S.R., Gibbs, R.L., Rosen, B.S., & Lee, J.T.  (2015).  The critical lift zone: Recognizing the need for safe patient handling equipment across the broader spectrum of patient weights. *American Journal of Safe Patient Handling & Mobility*, 5(3), 108-16

Crtalic, A.K., Gibbs, R.L., Sprong, M.E., & Dell, T.F. (2015).  Boundaries with social media: Ethical considerations for rehabilitation professionals.  *Journal of Applied Rehabilitation Counseling*, 46(3), 44-50

Gibbs, R.L., Rosen, B.S., & Lacerte, M. (2013).  Published research and physiatric opinion in life care planning.  *Physical Medicine and Rehabilitation Clinics of North America*, 24(3), 553-66

Gibbs, R.L., Crtalic, A.K., & Blackwell, T.L. (2013).  Test review: The earning capacity assessment form – 2nd edition.  *Rehabilitation Counseling Bulletin*, 57, 57-59

Rosen, B.S., Gibbs, R.L., & Crtalic, A.K. (2013).  Estimating life expectancy.  A physiatric perspective. *Journal of Life Care Planning*, 12(1), 3-13

Gibbs, R.L., O'Brien, A.M. & Waldmann, A.K. (2011).  Vocational considerations in the nurse life care plan. *Journal of Nurse Life Care Planning*, 10(2), 413-19

Morton, M. V., Gibbs, R. L. & Ragland, M. (1997).  The rehabilitation counselor-employment specialist relationship: A collaborative approach. *Journal of Vocational Rehabilitation*, 9(2), 153-57

Gibbs, R. L., Dodd, J. M., Hecimovic, A., & Nickoloff, E. (1996).  Managed care administrators' opinion of vocational rehabilitation services. *Journal of Applied Rehabilitation Counseling*, 27(1), 42-44

**Professional Memberships**
Brain Injury Alliance of Montana
International Association of Rehabilitation Professionals
International Brain Injury Association
Montana Association for Rehabilitation
Rehabilitation Association of Montana
Society for Cognitive Rehabilitation

**Professional/Volunteer Activities – Present**
- Chairman, Board of Directors, Valley Credit Union, April 2015 to date
- Member, Board of Directors, Valley Credit Union, November 2011 to date
- Member, Montana State University-Billings, Master of Science in Rehabilitation and Mental Health Counseling Advisory Board, April 2009 to date

**Professional/Volunteer Activities – Previous**

- Commissioner, International Commission on Health Care Certification, January 2019 to June 2019
- Vice-chairman, Board of Directors, Valley Credit Union, May 2013 to April 2015
- Chairman, Board of Directors, Yellowstone Club Estates Owners Association, May 2014 to May 2017
- Member, Board of Directors, Yellowstone Club Estates Owners Association, May 2012 to date to May 2017
- Member, International Association of Rehabilitation Professionals Standards of Practice Advisory Group, 2013 to 2014
- Member, Academy of Forensic Rehabilitation Research, September 2010 to September 2014
- Member, 2014 Conference Planning Committee, International Symposium on Life Care Planning, March 2014 to September 2014
- Member, Yellowstone Family Park Committee, April 2010 to March 2013
- Member, Non-Dues Income Committee, International Association of Rehabilitation Professionals, November 2012 to January 2013
- Member, 2012 Conference Planning Committee, International Association of Rehabilitation Professionals, October 2011 to October 2012
- Member, Expansion Planning Committee, COR Enterprises, January 2008 to June 2011
- Member, Finance Committee, International Association of Rehabilitation Professionals, February 2007 to February 2009
- Member, Traumatic Brain Injury Advisory Council (Governor Appointment), January 2004 to January 2006
- Member, Education/Social Committee, Montana Association for Rehabilitation – Billings Chapter, November 2004 to November 2005
- Member, Montana Training Network, June 2004 to November 2005
- President, Brain Injury Association of Montana, September 2002 to September 2005
- Member, St. Vincent Healthcare Ethics Committee, February 2002 to February 2005
- Sponsorship Coordinator, Montana Association for Rehabilitation, June 2001 to October 2004
- Committee Member, Montana TBI Advisory Council, July 2001 to December 2003
- Disaster Mental Health Services Technician, American Red Cross, November 2001 Disaster Relief Operations include: DR 787, World Trade Center--Ground Zero, Shift Supervisor
- Coordinator, Montana Association for Rehabilitation Legislative Committee, Public Testimony for Vocational Rehabilitation Appropriations Bill, 2001 and 2003 Montana Legislature
- Vice President, Brain Injury Association of Montana, September 2001 to December 2002
- Member, Montana Case Management Association Education Committee, April 2000 to April 2002
- Advisory Board Chair, Brain Injury Association of Montana-Billings Chapter, April 1997 to August 2000

**Professional/Volunteer Activities – Previous** *continued*
- Chair, City of Billings, Americans with Disabilities Act Compliance Committee, April 1999 to April 2001
- Coordinator, Montana Association for Rehabilitation Annual Conference, 1997
- President, Montana Association for Rehabilitation, June 1996 to January 1998
- President, Graduate Student Association, Montana State University-Billings, September 1993 to September 1994

**Professional Awards**
- Recipient, 2016 Montana Association for Rehabilitation Louis Allard Award
- Recipient, 2010 Montana Association for Rehabilitation Achievement Award
- Recipient, 2005 Montana Association for Rehabilitation Meritorious Service Award

**Invited Facilitation**
- International Association of Life Care Planners, Life Care Planning Summit 2017, Facilitator of "Associated Costs and Litigation" section
- International Association of Life Care Planners, Life Care Planning Summit 2015, Facilitator of "Business Practices" section
- International Association of Life Care Planners, Life Care Planning Summit 2012, Recorder of "Best Practices for Establishing Foundation for Life Care Plans" section
- Canadian Life Care Planning Summit 2011, Facilitator of "Life Care Plan Reliability and Validity" section

**Presentations**

Gibbs, R.
Ethics in the Land of MILP and Honey. All day ethics training presented to state-wide staff for the Montana Independent Living Program, Three Forks, Montana, May 17, 2019

Gibbs, R.
Social Media Use and Ethical Considerations and Ethics in the Rural Setting. Presented to the State of North Dakota Division of Vocational Rehabilitation, January 9, 2019

Yuhas, S. & Gibbs, R.
Effective Rebuttal Techniques and Defense Pitfall in Life Care Planning and Vocational Wage Loss Analysis. Presented to the South Carolina Defense Trial Attorneys' Association's Annual Meeting, Sea Island, Georgia, November 10, 2017

Allison, K. & Gibbs, R. (Co-facilitator)
Lung and Liver Transplantation: Life Care Planning Considerations. Presented to the International Association of Rehabilitation Professionals, St. Louis, Missouri, October 12, 2017

## Presentations *continued*

Gibbs, R.
> Ethics in a Forensic Setting.  Presented to the American Rehabilitation Economics Association, San Diego, California, May 12, 2017

Gibbs, R.
> Fostering Creativity to Solve Everyday Problems.  Presented to the Montana Association of Rehabilitation, Miles City, Montana, October 17, 2014

Constantini, P., Seyler, C., & Gibbs, R.
> Relationship Building: How Do I Get a Case?  Presented to the International Symposium on Life Care Planning, Minneapolis, Minnesota, September 18, 2014

Gibbs, R. & Lutton, K.
> The Virtual & Paperless Office: Best Practices in a Digital World.  Presented to the International Symposium on Life Care Planning, Minneapolis, Minnesota, September 18, 2014

Gibbs, R.
> Protecting Confidentiality and Using Social Media: Ethical Considerations Presented to the Senior Management Team, Valley Federal Credit Union, March 5, 2014

Gibbs, R.
> Receiving Gifts, Protecting Confidentiality, and Using Social Media: Ethical Considerations for Rehabilitation Counselors.  Presented to the International Association of Rehabilitation Professionals, Las Vegas, Nevada, February 8, 2014

Yuhas, S., Riddick-Grisham, S., Bagwell, D., Neulicht, A., & Gibbs, R.
> Life Care Planning Panel Discussion.  Presented to the International Association of Rehabilitation Professionals, Charleston, South Carolina, November 8, 2013

Gibbs, R. & Crtalic, A.
> Receiving Gifts, Protecting Confidentiality, and Using Social Media: Ethical Considerations for Rehabilitation Professionals.  Presented to the Montana Association of Rehabilitation, Butte, Montana, October 9, 2013

Gibbs, R.
> Evidence-based Life Care Planning: The Mark of Expertise.  Presented to the Montana Trial Lawyers Association, Missoula, Montana, November 4, 2011

**Presentations** *continued*

Gibbs, R. & Waldmann, A.
A Limited Review of Changes to the CRCC Code of Ethics.  Presented to
the Montana Association of Rehabilitation, Fairmont Hot Springs, Montana,
September 9, 2011

Wallace, A., Gibbs, R., Stein, D., Caragonne, P., & Sofka, K.
True Grit: Ethics Case Study.  Ethics round table presented at the Nebraska Chapter
of the International Association of Rehabilitation Professionals, Omaha, Nebraska,
May 21, 2011.

Gibbs, R.
The Rehabilitationist, Evidence, and Technology.  Presented at the Nebraska
Chapter of the International Association of Rehabilitation Professionals, Omaha,
Nebraska, May 21, 2011.

Gibbs, R.
Advantages, Benefits, and Best Practices Derived From a Standardized
Evidence-based Approach to Life Care Planning.  Presented to the
International Association of Rehabilitation Professionals, New Orleans,
Louisiana, November 5, 2010

Morris, J. & Gibbs, R.
Bullet Proof Your Life Care Plan.  Presented to the American Association
of Nurse Life Care Planners, Boston, Massachusetts, October 10, 2010

Gibbs, R.
Evidence-based Life Care Planning.  Presented to International
Symposium on Life Care Planning, Orlando, Florida, September 14, 2010

Gibbs, R.
An Evidentiary-based Approach to Life Care Planning.  Presented to the
Utah Association for Justice, Salt Lake City, Utah, September 9, 2010

Gibbs, R.
Evidence-based Life Care Planning.  Presented to The Florida Bar
Workers' Compensation Forum, Orlando, Florida, April 15, 2010

Mitchell, N., Wingate, T. & Gibbs, R.
How Physical and Occupational Therapy Recommendations Are
Determined in the Life Care Plan.  Presented to the International
Symposium on Life Care Planning, Chicago, Illinois, September 26, 2009

**Presentations** *continued*

Gibbs, R.

Extended Employment.  Presented to the State of Montana Vocational
Rehabilitation Services All-Staff meeting, Fairmont Hot Springs, Montana, May
13, 2009

Gibbs, R.

Brain Injury and Its Impact on Sexuality.  Presented to the Brain Injury Association
of Montana, Billings, Montana, May 1, 2009

Gibbs, R. & Nord, E.

What is Next in ADA Compliance: The ADA Including the Amendments Act of
2008.  Presented to the City of Billings, Billings, Montana, December 15, 2008

Rosen, B. & Gibbs, R.

Neuroendocrine Dysfunction: The Effects on Everyday Functioning. Presented to
the Brain Injury Association of Montana, Bozeman, Montana,
April 12, 2008

Gibbs, R.

Ethical Dilemmas in Rural Rehabilitation.  Presented to the Rehabilitation
Association of Montana, Billings, Montana, April 10, 2008

Gibbs, R.

Rehabilitating the Injured Worker.  Presented to Lorman Education Services
seminar, Workers' Compensation Update in Montana, Billings, Montana,
November 13, 2007

Gibbs, R.

Injury and Ethics.  Presented to Lorman Education Services seminar, Workers'
Compensation Update in Montana, Billings, Montana, November 13, 2007

Gibbs, R.

Neuroendocrine Dysfunction and the Injured Worker.  Presented to American
Board of Vocational Experts, Charleston, South Carolina, October 20, 2007

Gibbs, R.

The State of the Extended Employment Program in Montana.  Presented to
Montana Association for Rehabilitation Conference, West Yellowstone, Montana,
October 25, 2006

Gibbs, R.

Sexuality Issues After Brain Injury.  Presented to Brain Injury Association of North
Dakota, Fargo, North Dakota, September 8, 2006

**Presentations** *continued*

Gibbs, R.
<u>Brain Injury and the Life Care Planning Process.</u>  Presented to Brain Injury Association of North Dakota, Fargo, North Dakota, September 8, 2006

Gibbs, R.
<u>Brain Injury and Life Care Planning.</u> In-service training for STEP staff.  Billings, Montana, May 2, 2005

Gibbs, R., Marks, J., Jahner, R., & Laskowski, T.
<u>Long Term Post-TBI Community Reintegration.</u>  Panel presentation to Brain Injury Association of Montana Conference, Butte, Montana, September 24, 2004

Gibbs, R. & Rosen, B.
<u>Disability and Sexuality.</u>  Presented to the Community Services Bureau Conference, Billings, Montana, September 10, 2004

Gibbs, R.
<u>From Access to Advocating: Acquired Brain Injury Resources in Montana.</u> Presented to the McGuire Memorial Conference on Family Violence, Billings, Montana, October 31, 2003

Gibbs, R.
<u>Life Care Planning and Medical Case Management for Acquired Brain Injury.</u> Presented to Second Annual Native American Traumatic Brain Injury Conference, Great Falls, Montana, March 25, 2003

Cenatiempo, L., Gibbs, R., Kemp, R., & McGeshick, P.
<u>TBI/Domestic Violence/Rehabilitation Process: Injury to Recovery.</u>  Panel presentation to Second Annual Native American Traumatic Brain Injury Conference, Great Falls, Montana, March 24, 2003

Gibbs, R.
<u>Creativity.</u>  Presented to Montana Department of Commerce Conference, Miles City, Montana, October 30, 2002

Gibbs, R.
<u>Extended Employment Issues.</u>  Presented to Montana Association for Rehabilitation Conference, Miles City, Montana, October 17, 2002

Gibbs, R., Elliot, I., & Eby, N.
<u>Long Term Care and You: Traumatic Brain Injuries.</u>  Presented on Montana Public Broadcasting System, Bozeman, Montana, May 16, 2002

**Presentations** *continued*

Gibbs, R.
>   <u>Working with the Forensic Client.</u>  Presented to Billings Area Licensed Clinical Professional Counselors, Billings, Montana, June 27, 2001

Gibbs, R.
>   <u>Vocational Rehabilitation and the Injured Worker.</u>  Presented to Lorman Education Services seminar, Return to Work Issues in Worker's Compensation in Montana, Billings, Montana, November 7, 2000

Gibbs, R.
>   <u>Disability, Sexuality and Rehabilitation.</u>  Presented to Montana Association for Rehabilitation Conference, West Yellowstone, Montana, October 18, 2000

Gibbs, R.
>   <u>Sexuality, the Brain and How the Two Work Together.</u>  Presented to Brain Injury Association of Montana Conference, Great Falls, Montana, September 29, 2000

Gibbs, R.
>   <u>Vocational Rehabilitation.</u>  Presented to Montana Muscular Dystrophy Association Fall Workshop, Livingston, Montana, September 16, 2000

Gumm, D. & Gibbs, R.
>   <u>Neuroanatomy of Brain Injury and Vocational Implications.</u>  Presented to Montana Association for Rehabilitation Conference, West Yellowstone, Montana, October 7, 1999

Gibbs, R.
>   <u>Creativity and Problem Solving at Work.</u> Presented to Montana Association for Rehabilitation Conference, Billings, Montana, October 1, 1998

Sampson, M. & Gibbs, R.
>   <u>Everyday People as Supports.</u>  Presented to Wyoming Employment Conference, Casper, Wyoming, September 17, 1998

Pilsch, R. & Gibbs, R.
>   <u>Advantages and Disadvantages of Self-Employment.</u>  Presented to Common Threads Conference, Missoula, Montana, August 10, 1995

Gibbs, R.
>   <u>Comprehensive Assessment of Rehabilitation Needs.</u>  Presented to the State of Montana Vocational Rehabilitation All-Staff Meeting, Billings, Montana, May 23, 1995



ROCKY MOUNTAIN REHAB PC

# Publication History for Reg L. Gibbs

**Published Articles**

Smith, S.R., Gibbs, R.L., Rosen, B.S., & Lee, J.T.  (2015).  The critical lift zone: Recognizing the need for safe patient handling equipment across the broader spectrum of patient weights. American Journal of Safe Patient Handling & Mobility, 5(3), 108-16

Crtalic, A.K., Gibbs, R.L., Sprong, M.E., & Dell, T.F. (2015).  Boundaries with social media: Ethical considerations for rehabilitation professionals.  Journal of Applied Rehabilitation Counseling, 46(3), 44-50

Gibbs, R.L., Rosen, B.S., & Lacerte, M. (2013).  Published research and physiatric opinion in life care planning.  Physical Medicine and Rehabilitation Clinics of North America, 24(3), 553-66

Gibbs, R.L., Crtalic, A.K., & Blackwell, T.L. (2013).  Test review: The earning capacity assessment form – 2nd edition. Rehabilitation Counseling Bulletin, 57, 57-59

Rosen, B.S., Gibbs, R.L., & Crtalic, A.K. (2013).  Estimating life expectancy.  A physiatric perspective.  Journal of Life Care Planning, 12(1), 3-13

Gibbs, R.L., O'Brien, A.M. & Waldmann, A.K. (2011).  Vocational rehabilitation considerations in the nurse life care plan.  Journal of Nurse Life Care Planning, 10(2), 413-19

Morton, M. V., Gibbs, R. L. & Ragland, M. (1997).  The rehabilitation counselor-employment specialist relationship: A collaborative approach.  Journal of Vocational Rehabilitation, 9(2), 153-57

Gibbs, R. L., Dodd, J. M., Hecimovic, A., & Nickoloff, E. (1996).  Managed care administrators' opinion of vocational rehabilitation services.  Journal of  Applied Rehabilitation Counseling, 27(1), 42-44

ROCKY MOUNTAIN REHAB PC

**Schedule of Fees and Conditions for Forensic Services**
**Tax ID # 81-0538292**

| | | |
|---|---|---|
| **Retainer:** | A non-refundable retainer in the amount of $3,500 must be received before work will begin on a new case.  The retainer will be applied to charges for services rendered. | |
| | | |
| **Fee for Service:** | Consultation, Life Care Planning, or Employability Assessment | $250 / hour |
| | Medical Case Management | $150 / hour |
| | | |
| **Testimony:** | Deposition, Mediation, or Arbitration | $650 / hour |
| | Trial | $2,500 / half-day |
| | | $5,000 / full-day |
| | Preparation for deposition/trial | $250 / hour |
| | | |
| **Travel:** | Day Rate | $1,250 / half-day (≤ 5 hours) |
| | | $2,500 / full-day (5+ hours) |

**Conditions**
- A minimum half-day charge will apply for trial testimony and if the trial lasts more than 4 hours, the full-day fee will apply.
- Testimony will not be scheduled until any outstanding balance is paid in full.
- The fee for testimony must be paid in advance.
- The day rate is for travel time only and does not include the fee for testimony or charges for airfare, mileage, automobile rental, lodging, or meals.
- A minimum charge of $1,500 will apply in the event testimony is canceled within five business days of the scheduled date.  Charges for other completed purchases related to scheduled testimony will also apply.
- The half-day fee for trial testimony will apply in the event testimony is canceled within twenty-four hours of the scheduled time.  If applicable, the day rate for travel will also apply, as will any charges for completed purchases related to schedule testimony.
- Airline tickets, reservations, and other expenses necessary for completion of the case will be billed at cost.
- Payment is due upon receipt of invoice.  Monthly interest of 1.5% will be added to accounts in arrears for thirty days or longer (18% annual rate).

Last updated: 1-5-2018

Rocky Mountain Rehab, P.C.          P.O. Box 20253                    1690 Rimrock Road, Suite I
                                     Billings, MT 59104                Billings, MT 59102
                                     (406) 259-7495                    (406) 252-5773 Fax



ROCKY MOUNTAIN REHAB PC

**Testimony History for Reg Gibbs, MS**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 10/12/2015 | Baldacchino v. Kaiser Permanente Medical Group | Arbitration | Michelle Jenni | California Arbitration Act |
| 01/18/2016 | Nottingham v. Myers | Deposition | Mark Parker | Montana 8th Judicial District Court, Cascade County |
| 02/29/2016 | Ramstead v. Bell Cross Ranch, LLC, et al | Deposition | Perry Schneider | Montana 8th Judicial District Court, Cascade County |
| 03/09/2016 | Plenty Hawk v. Mansoor Sheikh, M.D. et al | Deposition | Neel Hammond | United States District Court, District of Montana, Billings Division |
| 11/20/2017 | Monte Selck v. Van Thuy Tran, Dinh Nguyen, and Does 1-10 | Trial | Joseph Kim | Superior Court of the State of California, County of Santa Clara |
| 05/06/2016 | Ellis v. Ellis | Trial | William Nelson | Montana 21st Judicial District Court, Ravalli County |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------| 
| 8/16/2016 | Stokke v. American Colloid Company, et al | Deposition | Dylan McFarland | Montana 22nd Judicial District Court, Carbon County |
| 8/29/2016 | Crump & Crump v. Rich Voss Trucking, Inc. | Deposition | Michael Kronlund | Superior Court of the State of California, County of Santa Clara |
| 8/30/2016 | Schmidt, et al v. Shasta County Sherriff's Office and Joel Dean | Deposition | Anthony Poidmore | Superior Court of the State of California, County of Santa Clara |
| 10/12/2016 | Robert Todd Simmons v. RPC Inc.; Cudd Energy Services, Inc.; Cudd Well Control, Inc.; EPI Consultants; Murex Petroleum Corporation; and Spec-Tech Threading, Inc. | Deposition | Jeff Weikum | District Court of Northwest Judicial District, State of North Dakota |
| 10/24/2016 | Cordero v. Anhalt | Deposition | Jon Heaberlin | Superior Court of the State of California, County of San Mateo |
| 10/25/2016 | Michelle Tally and William Henning v. Ace of Clubs, et al | Deposition | Jennifer Saccuzzo | Nevada District Court, Clark County |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------|
| 10/26/2016 | Robert Cunningham v. Harmon Transport and Ports to Plains Travel Plaza | Deposition | Laurence Stinson | United States District Court, Wyoming |
| 12/8/2016 | Marilu Schumann v. Plantation General Hospital, LTD. | Deposition | Renee Brandt | State of Florida, Division of Administrative Hearings |
| 12/15/2016 & 12/16/2016 | Justin McMahan & Danielle Bissell v. Rheem Manufacturing Company, et al | Deposition | Jeff Weikum | United States District Court, North Dakota Northeastern Division |
| 12/22/2016 | Clayton McCarty and Cheryl McCarty v. Liberty Mutual, et al | Deposition | Scott Olheiser | United States District Court, Wyoming |
| 3/1/2017 | Scot Decker v. I.E. Miller Services, Inc., et al | Deposition | Jeff Weikum | United States District Court, North Dakota Northwestern Division |
| 5/16/2017 | Denise L. Gray, f/k/a Denise L. Frye v. Petco Animal Supplies Stores, Inc. | Deposition | Scott Olheiser | United States District Court, Wyoming |

3

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 5/24/2017 | Margaret Lewis, individually and as Ad Litem for Nicholette Lewis and Alexis Lewis; and Jeffrey Lewis v. Ecosmart, Inc. et al | Deposition | Nandor Krause | Superior Court of the State of California, County of Sonoma |
| 6/8/2017 | Robert Cunningham v. Harmon Transport and Ports to Plains Travel Plaza | Trial | Laurence Stinson | United States District Court, Wyoming |
| 7/18/2017 | Heather Carpenter and Benjamin Carpenter as Natural Guardians and Next Friends of Gracie Carpenter, a minor, vs. St. Francis Hospital, Inc. | Deposition | Roger Sumrall | Superior Court of Muscogee County, State of Georgia |
| 8/2/2017 | Fermin Rodriguez, Jr. by and Through His Guardian Ad Litem Fermin Rodriguez, Sr. vs. The City and County of San Francisco | Deposition | David Delbon | Superior Court of the State of California, County of San Francisco |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------|
| 8/15/2017 | Ron Eacrett vs. John Miller Construction, Inc. and Does 1-10 | Deposition | Matt Braukmann | Montana 18th Judicial District Court, Gallatin County |
| 9/6/2017 | Christopher Wambeke and Julie Wambeke v. Ryan Schneider | Deposition | Colin Simpson | United States District Court, North Dakota Southwestern Division |
| 9/14/2017 | Roche Hahan and Marielisa Villasenor v. Morning Chuang, et al | Deposition | Elizabeth Landess | Superior Court of the State of California, County of San Francisco |
| 10/5/2017 | Simona Quezada v. Kaiser Foundation Hospitals | Deposition | David Rubaum | California Arbitration Act |
| 10/16/2017 | Simona Quezada v. Kaiser Foundation Hospitals | Arbitration | David Rubaum | California Arbitration Act |
| 11/15/2017 | Margarito Meza & Edelmira Meza v. Pacific Gas & Electric, PG & E Corporation, and Doe 1 through Doe 500 | Deposition | Matthew Warren | Superior Court of the State of California, County of San Francisco |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 11/20/2017 | Monte Selck v. Van Thuy Tran, Dinh Nguyen, and Does 1-10 | Trial | Joseph Kim | Superior Court of the State of California, County of Santa Clara |
| 11/27/2017 | Michael Butler v. Frederick Grauer, Stuart Jackson and SMJ Construction Co. | Deposition | Chad Greeson | Superior Court of the State of California, County of San Mateo |
| 12/4/2017 | Roche Hahan and Marielisa Villasenor v. Morning Chuang, et al | Trial | Elizabeth Landess | Superior Court of the State of California, County of San Francisco |
| 1/12/2018 | Teanna Ford v. David Theophilus Curvis, Jr. and City of Los Angeles | Deposition | Janine Jeffrey | Superior Court of the State of California, County of Los Angeles – Central District |
| 1/14/2018 | Pedro Aleman v. Long Beach Public Transit | Deposition | Virginia Kortz | Superior Court of the State of California, County of Los Angeles |
| 2/1/2018 | Lisa Warrington v. Great Falls Clinic, LLC | Trial | Adam Warren | Montana 8th Judicial District Court, Cascade County |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 2/9/2018 | Scot Decker v. I.E. Miller Services, Inc., et al | Trial | Jeff Weikum | United States District Court, North Dakota Northwestern Division |
| 2/13/2018 | Rachel Graves v. Kaiser Foundation Health Plan | Deposition | Scott McClain | California Arbitration Act |
| 3/8/2018 | Grainne Callan v. Christina Long, et al. | Deposition | Elizabeth Landess | Superior Court of the State of California, County of Santa Clara |
| 4/4/2018 | Samuel Percival Stewart vs. The City and County of San Francisco | Deposition | Rebecca Bers | United States District Court, Northern District of California |
| 6/4/2018 | Pack v. Marathon Oil Company | Deposition | Colin Simpson | State of Wyoming, County of Park |
| 6/12/2018 | Valencia v. Dominges | Deposition | Daniel Henderson | Superior Court of the State of California, County of Kern |
| 6/27/2018 | Zhou v. City and County of San Francisco & Hortscience, Inc. | Deposition | Mark Lipton | Superior Court of California, County of San Francisco |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------|
| 7/24/2018 | Nicholas Meyer v. McKenzie Electric Cooperative, Inc. & 4 T Construction, Inc. | Deposition | Mark Larson | United States District Court, North Dakota Western Division |
| 7/25/2018 | Chamberlin v. St. Mary's Medical Center, et al | Deposition | Meghan Horton | 15th Judicial Circuit Court, Palm Beach County, Florida |
| 7/26/2018 | Spanos v. Kaiser | Deposition | Kenneth Pivo | California Arbitration Act |
| 8/7/2018 | Watts v. City of Los Angeles & State of California | Deposition | John Wright | Superior Court of the State of California, County of Los Angeles |
| 8/9/2018 | Gonzalez v. Kaiser | Deposition | Christopher Cannon | California Arbitration Act |
| 8/22/2018 | Vasquez v. Bosa Development California, Inc. | Deposition | David Gibson | Superior Court of California, County of San Francisco |
| 8/24/2018 | Mitchell vs. Kaiser Foundation Health Plan | Deposition | Scott McClain | California Arbitration Act |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 10/2/2018 | Cintron v. Title Financial Corporation | Deposition | Robert Terrazas | United States District Court, Montana, Missoula Division |
| 11/27/2018 | Wickman v. E.R. Snell Contractor, Inc. | Deposition | Jason Wyrick | State of Georgia, State Court of Gwinnett County |
| 12/11/2018 | Konopelco v. Kaiser | Deposition | Katie Lafferty | California Arbitration Act |
| 12/21/2018 | Collins v. Alexander Ivan Barragan, Jose Barragan, Brenda Barragan, State of California - California Department of Transportation, County of Ventura, City of Thousand Oaks | Deposition | Maryam Azizi | Superior Court of California, County of Ventura |
| 1/15/2019 | Martz v. The City and County of San Francisco | Deposition | Tim Fama | Superior Court of California, County of San Francisco |
| 1/25/2019 | Brandi Didier, as Next Friend to H.G.H., a Minor Child v. FCA US, LLC | Deposition | Cary Slobin | United States District Court for the Eastern District of Texas, Sherman Division |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|---|---|---|---|---|
| 1/29/2019 | O'Brien v. Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals and Southern California Permanente Medical Group | Arbitration | Vincent Iuliano | California Arbitration Act |
| 3/19/2019 | Rachel Graves v. Kaiser Foundation Health Plan | Deposition (#2) | Scott McClain | California Arbitration Act |
| 3/20/2019 | Desiree Zavala, a minor, and Ashley Estrada, a minor, by and through their guardian ad litem, Betty Rios Zavala v. Kaiser Foundation Health Plan | Deposition | Robert McKenna | California Arbitration Act |
| 4/2/2019 | Rachel Graves v. Kaiser Foundation Health Plan | Arbitration | Scott McClain | California Arbitration Act |
| 5/2/2019 | Siefke v. Roger Jensen and Deer Valley Trucking, Inc. | Deposition | Ron McLean | District Court of Northwest Judicial District, State of North Dakota |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------|
| 5/20/2019 | Konopelco v. Kaiser | Arbitration | Katie Lafferty | California Arbitration Act |
| 5/21/2019 | Santillan v. Kulver Singh Bansel, Karter Trucking, Davinder Bansel | Deposition | Michael Kronlund | Superior Court of California, County of Santa Clara |
| 6/17/2019 | Robert Cazier v. Monsanto | Deposition | Justin Stalpes | Montana Eighteenth Judicial District Court, Gallatin County |
| 6/20/2019 | Faun Patzer v. Portland Adventist | Trial | John Hart | Multnomah County Circuit Court, Oregon |
| 7/26/2019 | Moran v. Kaiser | Deposition | Esther Kim | California Arbitration Act |
| 7/29/2019 | Schmidt, et al v. Shasta County Sherriff's Office and Joel Dean | Trial | Anthony Poidmore | United States District Court, Eastern District of California |
| 8/6/2019 | Santacruz v. Neurosurgical Medical | Deposition | Elizabeth Harris | Superior Court of the State of California, County of San Diego |

**Testimony History for Reg Gibbs, MS (continued)**

| Date | Case | Activity | Retaining Attorney | Jurisdiction |
|------|------|----------|--------------------|--------------| 
| 8/7/2019 | Moran v. Kaiser | Arbitration | Esther Kim | California Arbitration Act |
| 8/22/2019 | James v. Tello | Deposition | Michael Kronlund/ Chester Walls | Superior Court of the State of California, County of Stanislaus |
| 8/26/2019 | Ocasio v. C.R. Bard | Deposition | Tom Arbon | United States District Court Middle District of Florida, Tampa Division |
| 9/4/2019 | Duran v. Jerald Dennis Doyle & Holcomb Engineering Contractors, Inc. | Deposition | Allan Isbell | Superior Court of the State of California, County of Los Angeles, Central District |
| 10/1/2019 | Aguilar v. Graham Terrace LLC & Atweek Inc. and Townhouse Builders Inc. | Trial | Andrew Showers | Supreme Court of the State of New York, County of Kings |

Last updated: 10/1/2019