Laurence Stinson
Scott Stinson
STINSON LAW GROUP, P.C.
1421 Rumsey Avenue
Cody, Wyoming 82414
T: 307.587.0300
F: 307.527.6092
E: laurence@stinsonlawyers.com

Tom Keegan
KEEGAN, KRISJANSONS, & MILES, P.C.
1233 Bleistein
Cody, Wyoming 82414
T: 307.587.2385
E: t.keegan@kkmattorneys.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| RODNEY MIEARS and MARIAN MIEARS, husband and wife, | Civil Action No. 18-CV-225-NDF |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' TRAVERSE AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGES** |
| SYSCO MONTANA, INC. | |
| Defendant. | |

COMES NOW Plaintiffs, by and through their counsel, Stinson Law Group, P.C., and Keegan, Krisjansons, & Miles, P.C., and hereby submit their Traverse and Response to *Defendant's Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim*, [Doc. 38], and supporting brief, [Doc. 39].

## I.    OVERVIEW

In its Motion [Doc. 38] and brief [Doc. 39], Defendant seeks dismissal of the claim for punitive damages.  The single question before the Court is whether a reasonable jury could find that Defendant (not its driver) intentionally failed to act "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such [action] would, in a high degree of probability, result in harm to another." *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1055 (10th Cir. 2016).  For Defendant to prevail in its motion, there must be no plausible way a jury could find in Plaintiffs' favor on the punitive claim. For reasons discussed in detail herein, Defendant's conduct justifies sending the punitive question to the jury and Defendant's motion should be denied.

Defendant's truck driver crashed into Plaintiff Rodney Miears near Cody, Wyoming. Plaintiffs sued Defendant for the imputed negligence of its driver and also brought an independent claim (the punitive claim) against Defendant for its own conduct.  [Doc. 42, Amended Complaint.] It is critical to understand that the punitive claim is a direct claim against Sysco *for its own conduct*, not the conduct of its driver. These allegations are explicitly set forth in the Amended Complaint. [Doc. 42., ¶¶32-45]  The events and circumstances that form the basis of Plaintiffs' punitive damages claim are <u>not</u> a single event based upon the driver's conduct, but the combination of multiple acts knowingly undertaken by Defendant which had the effect of elevating profit and gain above public safety.    Plaintiffs allege that Defendant knowingly and willfully:  1.) operated an interstate trucking company with trucks that weigh 44,000 plus pounds and can present a severe danger to the motoring public;  2.) retained and dispatched a new, inexperienced driver with incomplete training;  3.) on a new, overly scheduled route and location; 4.) without preparing or training the driver on where to deliver;  5.) then ignored a prior non-injury crash and a resulting

scheduling problem; 6.) all in furtherance of its corporate culture of urgency for profit and gain; 7.) thereby knowingly and willfully placed the motoring public at risk and in doing so 8.) caused the injury and disability of Rodney Miears.

Plaintiffs rely upon the testimony of Defendant's two corporate representatives and driver, James Friede, to support each of these allegations and provide a citation to the testimony relied upon. Plaintiffs submit that under these facts a reasonable jury could find that Defendant intentionally failed to act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such action would, in a high degree of probability, result in harm to another. Therefore, there is a genuine dispute of material fact and summary judgment is inappropriate and must be denied.

Defendant's argument to the Court is twofold. First, Defendant argues that any misconduct in "hiring, retention, supervision and/or training" is a series of isolated, unrelated events, that do not violate the Federal Motor Carrier Safety Regulations (FMCSR). [Doc 39, p. 2, 24]. Second, Defendant argues that the standard set forth in the Restatement (Second) of Torts §909 for punitive damages against Defendant for Friede's conduct are not met. Therefore, Defendant argues, conduct necessary for punitive damages under Wyoming law does not exist under the facts in this case. Defendant plainly misunderstands and so misconstrues the fundamental basis of Plaintiffs' punitive allegation. This is neither a claim brought under the Restatement (Second) of Torts §909 for punitive damages against Defendant for Friede's conduct, nor is it solely or primarily a "hiring, retention, supervision and/or training" claim.[1]

Plaintiffs are mindful that conduct supporting a punitive claim is rare, that intent must be easily inferred from the conduct, that the purpose of punitive damages is to deter future conduct,

---

[1] Plaintiffs submit Defendants' misunderstanding of the claim is fatal to its Motion.  This is discussed further in Section V.

and that in most circumstances punitive damages are disfavored in Wyoming law.  With these caveats firmly in mind, Plaintiffs submit that all necessary requirements to send the punitive claim to a Wyoming jury are met in this case.

## II.      STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is only appropriate if the pleadings and admissible evidence produced during discovery, together with any affidavits, show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Western Diversified Services, Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005).  An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party is entitled to all reasonable inferences from the factual record, which is viewed in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.      RELEVANT FACTS

The following facts demonstrate conduct from which a jury could reasonably deduce or infer intentional conduct on the part of Defendant to show willful, knowing, wanton, and reckless disregard of the likelihood of harm to others – in this case, the motoring public in the five states serviced by Defendant.

a.   The Crash.

On June 15, 2015, a Sysco Montana tractor trailer crashed into Wyoming Highway Patrol Trooper Rodney Miears.  Sysco's driver and employee James Friede (Friede), unlawfully made a left-hand turn in front of Rodney Miears (Miears) on Highway 14-16-20 near Cody, Wyoming (hereinafter "the Crash"). [Doc. 42, Amended Complaint, 1.]   Defendant is apparently now

admitting fault for the crash. [Doc. 39, p. 2[2].]   Defendant has not admitted that it or its driver hurt Miears, or that the crash was foreseeable. Defendant reluctantly admitted the crash was preventable.  *Ex. 1*, Frank Depo., 46:4-46:9.

b.  Risk to the Public.

Defendant owns and operates a trucking delivery business in Billings, Montana, which delivers year-round throughout Montana, northern Wyoming, eastern Idaho, and the western parts of North and South Dakota.  *Ex. 1*, Frank Depo. 7:16 – 9:2; 17:20 – 18:4**.**  In and around 2015, Defendant operated approximately 100 trucks and employed 120 drivers, who drove approximately 5.5 to 5.7 million miles per year.  *Ex. 1*, Frank Depo. 22:2 – 24:25.   Defendant acknowledges that its operations present a recognizable risk to the public.  *Ex. 1*, Frank Depo., 29:8-29:17.

c.  Friede was a New, Inexperienced Driver.

On December 31, 2014, Friede applied for the position of delivery driver.  *Ex. 1*, Frank Depo., 57:13–16, 58:20 – 25.  Friede was hired by Defendant on January 27, 2015.  *Ex. 1*, Frank Depo., 66:19-23; *Ex. 2*, Friede Depo., 12:2–5.  When hired, Friede did not have the necessary Commercial Driver's License (CDL) but had obtained his CDL learner's permit approximately two weeks earlier on January 12, 2015.  *Ex. 2*, Friede Depo., 74:10–18.  At the time of Friede's application and hire, the official job description provided by Defendant's corporate office for a "delivery driver" required that a driver have a CDL and experience including: "A minimum 2 years previous delivery and/or 100,000 verifiable miles": *Ex. 1*,  Frank Depo., 68:8-13; *Ex. 3*, Job Description, p.2.

///

---

[2] Defendant's Brief says it does not seek to assess any fault to "the Defendants."  Presumably that is a typo given the rest of the qualified admission of liability.  [Doc. 39, p. 2, ln. 4.]

d. <u>Defendant Knew Friede was New.</u>

Defendant's Director of Transportation Bradley Frank testified as the 30(b)(6) corporate representative. *Ex. 1*, Frank Depo., 3:20-23. Frank testified that Friede did not meet the requirements for "delivery driver" when hired. *Ex. 1*, Frank Depo., 62:18 – 63:10. Sysco claims Friede was hired as a "driver trainee," which would have had a different job description and Friede would not have been a "delivery driver" until March 19, 2015 when he obtained his CDL, and then finished his 12-week Sysco training course on April 17, 2015. *Ex. 1*, Frank Depo*.,* 64:24–66:5; 66:24–67:5; *Ex. 2*, Friede Depo., 74:19–75:10. Notably, and quite significantly, Sysco admits that when it classified Friede as a "delivery driver" after he obtained his CDL and completed, as it were, his 12-week training program on April 17, 2015, he still <u>did not</u> meet the experience requirement of "2 years delivery and/or 100,000 miles" required by Sysco's corporate job description for a delivery driver. *Ex. 1*, Frank Depo*.*, 67:2–5, 68:3–13. This is further concerning because Defendant failed to complete Friede's training, as noted below.

e. <u>Defendant Turned a Blind Eye to Safety Training</u>:

Friede was provided copy of Sysco's Driver Training Program for Entry-Level Drivers (herein "Sysco Driver Training Materials"). These documents are used when training new drivers. *Ex. 1*, Frank Depo., 80:24 – 81:10; 120:6 – 9. The Sysco Driver Training Materials state that the purpose of the drivers training program is "to train qualified Warehouse Associates and Drivers with less than one year of Commercial Motor Vehicle (CMV) driving experience to safely operate CMVs." *Ex. 4*, Kelly Depo., 34:8-14 (Ex. 13 to Kelly Depo.); *Ex. 5*, Sysco Driver Training Materials, p.4. These materials also state that: It is Sysco's policy that all driver trainees will be properly and adequately trained to, among other things, prevent injury to themselves and others.

*Id*.  Sysco holds to the policy that, "[i]t is the responsibility of everyone at Sysco to exhibit safety awareness.  This policy intends to provide safety requirements relating to the use of Commercial Motor Vehicles." *Id*.  This means Defendant was well-aware of the danger that driving big trucks presented to the public.

As part of the training program, 30, 60, and 90-day and evaluations are supposed to be performed by the trainee's Supervisor and reviewed by the Director of Transportation. *Ex. 1*, Frank Depo., 98:9-99:9; *Ex. 6*, Coaching for Personal Development Transportation Form. According to Defendant's own policy, Friede should have had his 30-day evaluation on or around February 26, 2015, followed by a 60-day evaluation on or about March 28, 2015 and a 90-day evaluation at the end of his training on or around April 27, 2015. *Id*.  Sysco failed to do the 30-day evaluation until approximately April 3, 2015[3].  No 60-day or 90-day evaluation were performed at any time.  *Id.*; Ex. 6, 30-Day Evaluation*; Ex. 1*, Frank Depo., 94:14–101:9.

The purpose of these evaluations is to give the director of transportation the opportunity to evaluate how the driver trainee is performing. *Ex. 1*, Frank Depo., 117:13–16.  Defendant chose not have system or protocol in place for tracking when these evaluations were supposed to be performed and whether or not they were completed.  *Ex. 1*, Frank Dep*.,* 118:8 – 15; *Ex. 5*; *Ex. 4*, Kelly Depo*.*, 56:3–14.

f.   Defendant had a Warning Before the Crash:  The 30-Day Evaluation.

When Friede's 30-day evaluation was finally completed in April of 2015, Defendant noted under Safety, Improvement Areas:  "Try to eliminate distractions to improve safety."  The evaluation identifies the following failures and needed areas of improvement: "more experience" and "get used to manual transmissions."  *Ex. 6*, 30-Day Evaluation, p. 1-2.  Under Improvement

---

[3] According to the Exhibit 6, the coaching form, Mr. Friede's 30-day evaluation occurred on April 3, 2015. However, the 30-day evaluation document is signed and dated April 8, 2015 on the last page.

<u>Plan</u>, it states "Do 60 day & 90 day observation & keep up w/ good comm [*sic*] on any issues James may have." *Id.* Despite the warning on the 30-Day Evaluation indicating that Friede needed to eliminate distractions to improve safety, that he needed "more experience," and the conclusion that an action plan calling for 60-day and 90-day observations was necessary,……Sysco took none of those actions. Friede completed his driver training approximately two weeks later on April 17, 2015 and was then categorized as a "delivery driver" who was allowed to drive CMVs by himself and complete delivery routes alone. *Ex. 1*, Frank Depo., 71:2 –72:1.

When asked about whether a driver trainee's training could be extended beyond 12 weeks, Frank stated that Sysco MT can always train people longer than 12 weeks, but in Friede's case, the decision was made that that did not need to happen. *Ex. 1*., Frank Depo., 70:11–24. Frank had to admit that because the 60-day and 90-day evaluation forms were not completed, he - as director of transportation - did not have the opportunity to understand what additional training had occurred and whether Friede was properly trained and qualified to drive. *Ex. 1*, Frank Depo., 118:16 – 22.

g.      <u>Defendant Demands Delivery Drivers Act Urgently</u>.

Defendant insists that delivery drivers have a "sense of urgency". *Ex. 1*, Frank Depo., 106:7–9. Defendant trains its drivers to act urgently to get deliveries to customers. *Ex. 1*, Frank Depo., 107:16-19. Displaying a sense of urgency was important enough to Defendant that urgency is an area of review specifically included on each of the 30-day, 60-day and 90-day evaluation forms. *Ex. 1*, Frank Depo., 106:3 – 6; *Ex. 6*, 30-Day Evaluation, p. 3. On his 30-day evaluation form, Friede's evaluator stated "Yes, always in a hurry to take care of cust [*sic*]..." *Id.* No mention was made of any cautionary statements to Friede about hurrying given the safety concerns with

distractions.  Defendant conspicuously never addressed safety concerns in balance with urgency in training Friede or at any other time.

Friede was genuinely concerned about the pressure put on him by Defendant and he testified: "The only thing they [Defendant] train you is to keep up with the system that they have in place for say..for deliveries." *Ex. 2*, Friede Depo., 58:1–6. Friede testified that Defendant, like other delivery companies, has a system that tracks their deliveries, tells you how long it should take to make each delivery and shows you how far behind you are compared to where you should be if you were making timely deliveries.  *Id.*, 58:10–21.  He stated that Defendant always stressed to never get behind on the timing of deliveries and to maintain that standard. *Id.*  Friede noted that meeting that standard was harder on some routes than on others.  *Ex. 2*, Friede Depo*. 60:7–14*. As to the day of the crash, Mr. Friede said "I had to have a sense of urgency for sure, yeah." *Ex. 2,* Friede Depo*.*, 60:19–61:1.  Friede stated that he was not encouraged to break the law, but there was definitely a sense of urgency pressed upon the drivers to get the deliveries made on time, he explained: …"there was a sense of urgency to get the job done.  **The sense of urgency would be their standard**.  They wanted you to maintain their standard…" *Ex. 2*, Friede Depo., 102:20–104:17(emphasis added).

h.      An Ever Changing Driver Route.

From April of 2015 up to the time of the crash, Friede did not have his own delivery route because he was new, but instead acted as a floater driving various routes.  *Ex. 1*, Frank Depo*.*, 71:3–11.  However, while new hires are waiting to get a route, Defendant will try to put the new hires on the same routes on as much as possible, because route familiarity increases safety and efficiency.  *Ex. 1,* Frank Depo., 73:23 – 74:10.  Sysco MT's Safety Director Chuck Kelly also

agreed that having drivers repetitively drive the same routes increases safety and efficiency. *Ex. 4,* Kelly Depo., 67:8. But Defendant chose not to follow its safety rule for Friede.

      i.    <u>No Plan at All on Where and How to Deliver</u>.

When he caused the crash, Friede was making a delivery to Yellowstone Valley Inn (YVI). [Doc. 42, Amended Complaint.]. Defendant chose not to provide *any* instruction on where, how, or when to deliver, or which entrance or exit to use or where to leave the delivery. *Ex. 2*, Friede Depo*.*, 67:1–8. Friede testified that Defendant did not have a method for educating drivers on new locations, where the entrances and exits are located, and where the food was to be delivered. *Ex. 2*, Friede Depo., 66:15–25. As a result, at the time of the crash, Friede was, by his own account, a distracted driver paying attention not to the road but to where he should drive his huge truck in an area he had not previously delivered. *Ex. 2*, Friede Depo*.,* 66:4–10. Defendant has provided the court its *Exhibit A*, which is the on-board video from the truck crash. The video shows Friede urgently looking back and forth and back and forth at the parking lot into which he is trying to turn and <u>not</u> looking down the road to oncoming traffic. Defendant did not train Friede how to find information about getting to and accessing delivery locations. *Ex. 2*, Friede Depo., 111:24–112:24. Plaintiffs submits this is concrete evidence of Defendant's knowing lack of instruction as to deliveries.

Further, Sysco chose not to install an electronic navigation system in their tractor-trailers. In order to get directions to a new delivery location, Friede would have had to either look at a paper map or look up the location on his phone. *Ex. 2*, Friede Depo. 111:8 – 17.

When asked if he felt his unfamiliarity with the area and lack of instruction on where to go for his deliveries on the day of the crash was a contributing factor to the Crash, Mr. Friede stated:

> I'd say, obviously, being somebody that's been in the position of being new with the commercial driver's license, I think just being new with the commercials driver's license

is a big deal, and the fact that, you know, there's a lot of stuff that - - there's a lot of moving parts with the CMV that they're like not like a normal car.  You know what I mean? And I think that this in itself is an issue. And then when you throw in unfamiliarity, like driving something like that in an unfamiliar area, yeah that… I guess you could chalk that up to a distraction, because it's – unless you've been driving for a long time, it's a lot harder to keep all that stuff straight and be able to navigate. You know what I mean?...

*Ex. 2,* Friede Depo., 34:1 – 35:9.   Friede testified that if he had had more experience with a CMV the accident probably could have been avoided. *Ex. 2,* Friede Depo. *44:9 – 20.*

> j.    <u>Defendant's Second Warning Before the Crash: Friede's Bad Day.</u>

Friede testified that on the day of the crash, he was concerned about the increased number of stops on his route and that he was behind schedule. *Ex. 2*, Friede Depo. 105:6–107:14. His frustrations began that morning when he arrived at Defendant to find that additional stops, at locations to which he had never been, had been added to the Cody, Wyoming, route he had previously driven.  *Ex. 2*, Friede Depo., 105:12–15.  These extra stops would prevent him from being able to complete his route and make it back to Billings on the same day, given the mandatory maximum daily hours allowed by the Department of Transportation.  As a result, Friede was distressed that Defendant failed to warn him that this particular route likely required that he be away overnight, he did not have an over-night bag, and was not prepared to stay over-night.  *Ex. 2*, Friede Depo., 107:1–14.   Then on one of his first stops[4], the stack of his truck became stuck inside the parking awning near a BBQ delivery stop.  *Ex. 2*, Friede Depo., 105:22–106:6.  This caused Friede delay in continuing his route. *Ex. 2*, Friede Depo., 106:6-15.  To make matters worse, when Friede made his delivery stop at Dairy Queen that morning, two pallets of product fell over, requiring Mr. Friede to spend additional time picking up and restacking the product, causing Mr. Friede to fall further behind on his deliveries. *Ex. 2*,  Friede Depo., 105:6–11.

---

[4] Friede's was unsure whether he stopped at the BBQ restaurant or Dairy Queen first on the day of the Crash. However, since both stops occurred before the Crash, the order of the stops is immaterial as the getting the stack stuck on the truck occurred prior to the crash with Plaintiff Rodney Miears.

Defendant never provided Friede training, and to the best of his knowledge, Defendant did not have any sort of policy, regarding what to do if unforeseen circumstances cause a driver delay and put him behind on his deliveries. *Ex. 2*, Friede Depo., 107:15 – 108:12.   As a result, on the day of the Crash, Friede felt the continued pressure of urgency to get his route done, to get it done on time, and as a result of the problems he had experienced earlier in the day, to hustle faster to finish his route.  *Ex. 2*, Friede Depo., 108:13–21.

      k.     <u>Defendant Knew Friede was in Trouble Before the Crash but Failed to Act</u>:

Friede called his supervisor to report what happened with the truck being stuck and was instructed to take pictures and document any damage to fill out a report upon his return.  *Ex. 2,* Friede Depo.,109:8–111:2.  During this conversation, Mr. Friede was not instructed to deviate from his route and was not instructed how to meet the deadlines in a timely, safe, and non-hurried manner. *Ex. 2,* Friede Depo., 109:8 – 111:2.  Defendant, aware of the problem, took no action.

      l.     <u>A Conscious Decision to Risk Safety</u>.

Sysco's 30(b)(6) representative and Director of Transportation Frank, admitted in his deposition testimony that truck drivers must be trained to prevent crashes, that a trucking company must not put profit over safety, that the responsibility to prevent trucking crashes lies first with the trucking company, and that the trucking company is responsible for accidents caused by their drivers. *Ex. 1,* Frank Depo., 19:5–20:17.

Whitney Morgan is a retained expert for the Plaintiffs and a specialist in commercial motor vehicle compliance, enforcement and safety of operations. *Ex. 7*, Morgan Depo. 1:11-14. His report concluded that "Clearly Mr. Friede had issues at previous stops on the date of the accident and Sysco was putting profits over safety by hiring and utilizing an entry-level driver." *Ex. 7*,

Morgan Depo., 150:15 – 20.  During his deposition, Mr. Morgan explained the basis for his opinion

as follows:

> The main thing that impacts the ultimate conclusion is the fact that Mr. Friede was an entry-level driver and he had a new route and he had more stops than he had previously had.
>
> And also, they didn't follow through with the two-year 100,000-mile policy, Company policy and procedure or the 30-, 60-, and 90-day driver's evaluation.  They only did the 30-day evaluation, so they weren't properly monitoring him.  And then they gave him more than he felt like he could handle on the date of the accident.  And according to Mr. Friede himself, that's the reason for his level of distraction at the time along with the fact that he had had a couple of issues arising during the day with his deliveries.

*Ex. 7*, Morgan Depo., 127:11 – 25; 150:17 – 153:9.

With regards to the botched training evaluations, Morgan stated that these evaluations are

not Federal Motor Carrier Act standards but are part of Defendant's self-identified training policies

and procedures for safety and were not followed. *Ex. 7*, Morgan Depo., 135:5 – 17.  Morgan further

explained that based on his forty plus years of experience, "the reason for doing the training and

the evaluations is to determine whether or not the driver has demonstrated that he's capable of

safely operating the vehicle."  *Ex. 7*, Morgan Depo., 136:14 – 18.

## IV.    LEGAL ANALYSIS

Under Wyoming law, punitive damages are disfavored "and are to be allowed with caution

within narrow limits."  *Weaver v. Mitchell,* 715 P.2d 1361, 1369 (Wyo.1986).  The conduct of

Sysco makes this case fit firmly within those narrow limits set forth by the Wyoming Supreme

Court.

### a.    Motor Carriers and Direct Liability for Punitive Damages

This court has recognized direct negligence claims for punitive damages against motor

carriers. *Hockaday v. Aries Logistics.  Order Denying Defendants' Motion for New Trial and/or

Remittitur*, Document 294, pages 14-16, 2:14 -cv-260-ABJ, (D.C. Wyo., 2018).   This is also the

majority rule: Motor carriers are directly liable in punitive damages for their willful and wanton misconduct in training or retention or driver supervision or any other acts that are in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another."[5]. *Frederick v. Swift Transportation Co.*, 616 P.3d 1078, 1081 (10th Cir. 2010) (citing:  *Coville v. Ryder Truck Rental, Inc.,* 30 A.D.3d 744, 817 N.Y.S.2d 179, 180 (N.Y.App.Div.2006); *McHaffie v. Bunch,* 891 S.W.2d 822, 826 (Mo.1995); *Tindall v. Enderle,* 162 Ind.App. 524, 320 N.E.2d 764, 768 (1974)).  See also: *Hunt v. Roadway Express, Inc*., 2009 WL 10698635, 2 (D. Wyo. 2009) and cases cited therein.  As these cases make clear, this rule is true even when respondeat superior liability has been admitted.

### b.    Elevating Company Gain/Profit Over Safety is Punitive Conduct

"[I]n order to impose punitive damages against an employer, its conduct must be found to be willful, reckless, or wanton, apart from the conduct of its employee" *Frederick.,* at 118 (citing *Gillingham v. Reliable Chevrolet,* 966 P.2d 197, 203 (N.M.1998)).   When applying this standard, the 10th Circuit has held that punitive damages against an employer are appropriate when sufficient evidence is provided to establish that the employer "knowingly embarked upon a course of conduct dangerous to the public, motivated by private gain." *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1560 (10th Cir. 1991)(emphasis added).  In fact, "[m]oney [taking] precedent over safety" is virtually the definition of the kind of corporate behavior warranting an award of punitive damages. *Trotter v. B & W Cartage Co.,* No. 05-CV-0205-MJR, 2006 WL 1004882, at *7 (S.D. Ill. Apr. 13, 2006).

---

[5] This is the punitive standard expressed in *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1055 (10th Cir. 2016).

c.   <u>A Reasonable Jury Can Readily find Conduct Warranting Punitive Damages.</u>

Defendant has focused its analysis on "hiring, retention, supervision and/or training."  But those things are but a small part of the conduct Plaintiffs contend support the punitive damages claim, and but a small part of the conduct that should go to the jury to determine whether willful and wanton misconduct in reckless disregard of harm exists.  The conduct at issue is not as narrow a picture as Defendant would like to paint.  Rather, the evidence through testimony of Defendant's representatives and driver is that for all relevant times:

1.  Defendant was knowingly and willfully operating an interstate trucking company/motor carrier using trucks that weigh 44,000 plus pounds and are known to present a severe danger to the motoring public.  Defendant is a large operation with roughly 120 drivers and 100 or more trucks.

2.  Defendant knowingly and willfully retained a new, inexperienced driver.  While Defendant forcefully attempts to explain the reasons why Friede was hired with no experience, the testimony during the deposition was that the hiring policy required experienced drivers and Defendant knowingly chose to violate its own policy in hiring Friede. The importance here is that Defendant knew Friede was new.  Said another way, Defendant knew that Friede had no experience and that the only instruction he would get to operate a 44,000 pound truck safely in interstate commerce was from Defendant.

3.  With this knowledge, Defendant failed to complete his training, and this is easily verifiable because Defendant did not complete the 60 day and 90 day training forms.

4.  What was included on the only training evaluations - the 30 day training evaluation - was alarming because it was a warning that driver Friede needed more training and was easily distracted.  Defendant ignored these warnings.

5.   On June 15, 2015, the day of the crash, Defendant knowingly and willfully dispatched Friede on a new route that Friede had never driven and the route was overly scheduled with more stops than normal.  Defendant failed to prepare or warn Friede about this change which predictably caused agitation to Friede.   Defendant knew, or should have known, that sending new drivers to new locations with zero instruction on how and where to deliver presented an increased risk to the public.

6.   Defendant knowingly and willfully had no system to prepare a driver for a new location despite the high risk this presented.  In 2015, technology was readily available in the form of programmable GPS to solve this problem.  Given the ready availability of technology, the logical and only possible reason Defendant failed to do so is to maximize its gain (not expending the cash to use GPS) at the expense of safety to other motorists.  This is a reasonable inference and one a jury can easily make.

7.   The driver testified he alerted Defendant to a prior non-injury crash and a scheduling problem and Defendant ignored the driver's warning.  Defendant, on the other hand, claims it never received such notice.  What can a jury conclude is likely?  That a driver suffering a traumatic, schedule altering event notified Defendant of the same and Defendant, in a continued effort and history of trying to maximize its gain over safety, ignored the warning.

8.   Plaintiffs allege, and evidence supports, that these actions were taken in a consistent corporate culture of creating urgency for private gain with zero balancing of safety;

9.   Defendant took each of these actions knowingly and willfully and such acts were in reckless disregard of the public thereby causing injury and disability to Rodney Miears.

The *Lompe* case is similar to the present case given the similarity in conduct from which a jury can deduct willful and wanton misconduct. The Court in *Lompe* said:

Viewing the evidence in the light most favorable to Ms. Lompe, we conclude a reasonable jury could find AMC engaged in willful and wanton misconduct warranting punitive damages under Wyoming law. Specifically, AMC was on notice of the dangerous condition of the complex's fleet of furnaces well before Ms. Lompe's CO incident. AMC knew the furnaces were nearly thirty years old despite having a useful life of about twenty years, and AMC failed to act on bids for regular safety inspections of the furnaces despite three CO leaks at the Sunridge Apartments prior to Ms. Lompe's injury. On this record, a reasonable jury could find that AMC intentionally failed to act "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such [inaction] would, in a high degree of probability, result in harm to another." *See Cramer,* 204 P.3d at 979. Specifically, the age of the furnaces, the prior failures, and the proven risk of the escape of dangerous levels of CO made it almost certain that a repair-as-needed maintenance program, in this instance, would result in serious injury to one or more tenants. Accordingly, we affirm the district court's denial of JMOL on punitive damages as to AMC.

*Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1057 (10th Cir. 2016). The court in *Lompe* looked at the totality of the circumstances that led to the harm.  Like the jury in *Lompe*, under these facts, a reasonable jury could find Defendant engaged in willful and wanton misconduct warranting punitive damages under Wyoming law.

The case of  *Glover v. Trans. Corp. America, Inc.,* 57 F. Supp.2d 1240, 1245 (D. Wyo. 1999) is also instructive.  In *Glover,* Judge Johnson found there was sufficient evidence to present punitive damages to the jury where a prisoner was injured when the prison transport van crashed due to the negligence of the van's driver.  Plaintiff alleged that defendant motor carrier's own actions justified sending punitive damages to the jury because of (1) a policy prohibiting the use of safety belts by prisoners; (2) providing too little training for its drivers; (3) allowing and encouraging its drivers to work excessive hours causing driver fatigue and auto accidents; (4) failure to adequately supervise its drivers; and (4) "blatant disregard of safety laws."  This Court held that a reasonable jury could find that defendant's rules would likely result in such driver fatigue that the rules establish defendant's wanton disregard of its duty for the safety of the prisoner/passengers "under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in

substantial harm to another." *Glover v. TransCorp. America, Inc.,* 57 F. Supp.2d 1240, 1245 (D. Wyo. 1999) (quoting *Danculovich v. Brown,* 593 P.2d 187, 193 (Wyo.1979).

The only pertinent question under Defendant's Motion for Summary Judgement is whether reasonable people could disagree on the imposition of punitive damages. Under the facts set forth, it is definitely true that reasonable people could disagree on the imposition of punitive damages. One district court summed it up in a cell phone truck crash case like this:

> Under the facts in the record, which are viewed in the light most favorable to Plaintiff, Plaintiff has presented evidence of Dildine being on his cell phone at or near the time of the accident and ignoring company policy regarding the use of cell phones while driving. Plaintiff has also presented sufficient evidence showing a genuine dispute over whether Dildine was driving during excessive hours. The Court finds reasonable people may disagree on the character of Dildine's conduct and whether it warrants imposition of punitive damages. Therefore, this issue may not be disposed of on summary judgment.

*Ferrell v. BGF Glob., LLC*, No. CIV-15-404-D, 2018 WL 746399, at *3 (W.D. Okla. Feb. 6, 2018).  Plaintiffs submit that under the multitude of facts set forth here, a jury could easily find Defendant's conduct warrants the imposition of punitive damages and so summary judgment is improper. The facts show that Defendant turned a blind eye to safety for their own gain and this was intentional. Friede summed it up when he said, … "there was a sense of urgency to get the job done. **The sense of urgency would be their standard**.  They wanted you to maintain their standard…" *Ex. 2*, Friede Depo., 102:20–104:17 (emphasis added).

d.   <u>The Purpose of Punitives is Deterrence and Defendant Needs to be Deterred.</u>

In *Prager v. Campbell Cty. Mem'l Hosp.,* No. 10-CV-202-J, 2011 WL 13247548, at *3–4 (D. Wyo. Sept. 6, 2011), this Court looked to the Wyoming case of *In Farmers Insurance Exchange v. Shirley*, 958 P.2d 1040 (Wyo. 1998) and *Alexander v. Meduna*, 47 P.3d 206, 218-219 (Wyo. 2002) (some citations omitted), wherein the Wyoming Supreme Court adopted the punitive damages factors enunciated in *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134

L.Ed.2d 809 (1996), to evaluate punitive damages.  While *BMW v. Gore* heavily analyzed the ratio of punitive damages to compensatory damages,  it also provided seven factors adopted from a specially concurring opinion in *Aetna Life Insurance Company v. Lavoie*, 505 So.2d 1050, 1062 (Ala. 1987), that Plaintiff submits support sending the punitive damages claim to the jury.  Those factors are:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damage should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

Plaintiffs acknowledge that the focus of certain of these factors is on the size of the award. However, significant for the present analysis is that punitive damages are designed to deter and therefore prevent bad conduct and the financial gain that comes with it. Specifically, factors 1, 2, 3, and 7 all address deterring repeat conduct.

Defendant operates and dispatches 100 or more trucks weekly into five different states. The possibility of harm from Defendant's reckless safety practices is phenomenal, ongoing, and persistent.  Indeed, Defendant repeatedly reports to FMCSA more than a dozen crashes a year. https://ai.fmcsa.dot.gov/SMS/Carrier/53565/History.aspx. See also *Ex. 8*, Safety Measurement Reports (SMS) from FMCSA for 2015, 2016, 2017, 2018, to present with crash reporting colorized in yellow.  The present-day danger of prioritizing urgency is an ongoing topic of news in a climate where there are continuous reports about the danger of prioritizing urgency.  See, e.g., https://www.buzzfeednews.com/article/carolineodonovan/amazon-next-day-delivery-deaths; https://medium.com/@kimber_lockhart/don-t-create-a-sense-of-urgency-foster-a-sense-of-purpose-724e309ecdb0 (A sense of urgency almost always backfires).   Global carrier Amazon has taken to severing ties with delivery companies that hurt or kill people.  See https://www.propublica.org/article/amazon-cuts-contracts-with-delivery-companies-linked-to-deaths.

Defendant's conduct continues to present an immediate risk of harm to the public.  Punitive damages are designed to force bad corporate actors like Defendant to make changes for the safety and well-being of all members of the community.  Defendant's culture of urgency is dangerous to the public and warrants jury consideration.

## V.     DEFENDANT'S ARGUMENT

Defendant's argument fundamentally misunderstands (or intentionally misstates) the case that Plaintiffs bring.  In this regard, there are several important events.  First, on October 29, 2019, Plaintiffs filed their motion to amend complaint which contained a copy of the proposed amended complaint. [Doc. 32 and 32-1.]  Defendant references the amended complaint in its Motion, [Doc. 39].  Thus, Defendant was plainly on notice of Plaintiffs Amended Complaint prior to filing its

present motion.  This same proposed amended complaint is filed as the Amended Complaint. [Doc. 42].   Second, the Amended Complaint painstakingly sets forth the conduct that Plaintiffs allege provides sufficient basis for the punitive claim and that is found in ¶¶ 32-45 under a section entitled, "Punitive Damages Against Defendant Sysco."  The misconduct alleged is the conduct of Sysco, not its driver.  Third, The Amended Complaint separately identifies an "imputed negligence" claim for the conduct of the driver.  [Doc. 42, ¶27.]

Against this backdrop, Defendant is plainly on notice of the claims that Plaintiffs are bringing against it.   For example, Plaintiffs allege that Defendant "elevated urgency above safety and created a corporate culture of urgency which, as a motor carrier operating more than 100 tractor-trailers, was in reckless and conscious disregard of the safety of the public."  [Doc 42, ¶44.]  The law is clear that such conduct can warrant the imposition of punitive damages.  Yet Defendant failed to specifically explain how its culture of urgency does not create a safety risk. Instead, Defendant argues that Friede may have felt rushed, but what can it do because that does not violate any specific standard.   [doc. 39, p. 24.]   Defendant seems to permanently misunderstand throughout its brief that the punitive claim against it does not rely on a violation of the 42 C.F.R. applicable to truck company safety reporting to the FMCSA.  Rather, the punitive claim relies on the Wyoming legal standard for punitive damages.  *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1057 (10th Cir. 2016)

Defendant mostly appears to be rebutting a claim never made.  This is clearly revealed in its "conclusion" section when, to summarize the entire point of its motion, Defendant argues that, "[p]unitive damages may be awarded against an employer for the wrongful conduct of its employee in limited circumstances."  An argument not at all relevant to Plaintiffs' punitive claim against Defendant.  For this reason, Plaintiff submits that not only is there a sufficient basis to

send the punitive claim to the jury on the grounds that Plaintiffs actually allege, but that Defendants motion must be denied because it seeks summary judgment against a claim never made.

## VI.    CONCLUSION

Plaintiffs are well aware that conduct sufficient to send the question of punitive damages to the jury is a rare event in Wyoming law.  That being said, Plaintiffs submit that the case at bar presents a genuine dispute of material fact because a reasonable jury could find that Defendant intentionally acted "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such [action] would, in a high degree of probability, result in harm to another."  All factors which are needed to submit a punitive case to the jury are present in this case.  In punitive cases like this, intent must necessarily be inferred because it is surpassingly rare for a large corporate actor like Defendant to have or disclose the smoking gun that says, "let's put profit over safety and we know we will hurt people but is a risk we knowingly take."  Rather, the intent must be inferred from the circumstances.

Here there are not one or two instances where Defendant knowingly and willfully turned a blind eye to conduct that had a high degree of probability to hurt another, but a dozen instances where Defendant could have taken reasonable steps to ensure safety of the public and *chose* not to do so. This crash is not a random accident cause by the weather or an unexplained act beyond the control of Defendant. This crash is the direct result of a corporate culture which elevated profit and gain above the safety of the public. Injury and mayhem were a certainty under Defendant's policies.   Intent is easily and plausibly inferred from the factual circumstances that Plaintiffs have set forth herein.

Defendant's entire purpose is to get drivers on the road so it can make money. While there

is nothing inherently bad or wrong about making money, Defendant's drive for profit must lawfully include safety given the one hundred 44,000 pound trucks Defendant deploys everyday into our communities.  Plaintiffs submit the facts indisputably show that Defendant consciously ignored safety in all sorts of manners and means. But, at the very least, this is not an issue ripe for determination on summary judgment and the question should go to the jury.   For the many reasons identified herein, the undersigned respectfully submits that this is not an issue the court can resolve by summary judgment and  Defendant's Motion should be denied.

**DATED** this 2nd day of December 2019.

**Stinson Law Group, P.C.**

By: */s/ Laurence W. Stinson*
Laurence W. Stinson, WSB No. 6-2918
1421 Rumsey Avenue
Cody, Wyoming 82414
T: 307.587.0300
F: 307.527.6092
E: laurence@stinsonlawyers.com
*Attorney for Plaintiffs*